No. 15-1534 T
(Judge Elaine D. Kaplan)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
————————

LARRY D. JARNAGIN AND
LINDA JARNAGIN
Plaintiffs

v.

THE UNITED STATES,
Defendant

————————

**MOTION AND BRIEF OF THE UNITED STATES FOR SUMMARY JUDGMENT**
————————

DAVID A. HUBBERT
Acting Assistant Attorney General
Tax Division
U.S. Department of Justice

DAVID I. PINCUS
JASON S. SELMONT
BLAINE G. SAITO

Attorneys, Tax Division
U.S. Department of Justice
Court of Federal Claims Section
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-3338
Fax: (202) 514-9440
jason.s.selmont@usdoj.gov

# TABLE OF CONTENTS

MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT ................................1-2

BRIEF IN SUPPORT OF THE MOTION OF THE UNITED STATES
FOR SUMMARY JUDGMENT.............................................................................................1

INTRODUCTION ...............................................................................................................1

QUESTIONS PRESENTED................................................................................................2

FACTS ...............................................................................................................................3

    I.      The Plaintiff's Background...................................................................4

            A.  Larry Jarnagin ..............................................................................4

            B.  Linda Jarnagin .............................................................................5

    II.     The Jarnagins' Return Preparation........................................................7

            A.  Misty Fairchild...........................................................................9

            B.  The Jarnagins' U.S. Return Preparers ....................................... 11

               1.  Crook's Accounting Service ................................................ 11

               2.  Kyle Zybach ........................................................................ 13

    III.    The IRS Examination........................................................................... 16

SUBJECT MATTER JURISDICTION ............................................................................. 17

SUMMARY JUDGMENT STANDARD ........................................................................... 17

ARGUMENT ................................................................................................................... 18

    I.      Statutory and Regulatory Framework for the FBAR Penalty.................................. 18

            A.  The Requirement to Report Foreign Financial Accounts. ............................ 18

            B.  The Reasonable Cause Defense. ................................................................ 20

# TABLE OF CONTENTS (Cont.)

II.      The Jarnagins Are Liable for a Non-Willful FBAR Penalty for Each Year From 2006 through 2009 ...................................................................................... 23

      A.  The Jarnagins Failed to Report a Foreign Financial Account In Which They Had an Interest and Over which They Had Signing Authority ............................................................................................................ 23

      B.  The Jarnagins Cannot Establish a Reasonable Cause Defense .................... 24

          1.  The Jarnagins Failed to Report Income From the CIBC Account on their Income Tax Return and Failed to File FBARs ........................................................................................... 25

          2.  The Jarnagins Failed to Exercise Ordinary Care and Prudence ...................................................................................... 25

          3.  The Jarnagins Reliance on Their Accountants Was Not Reasonable ...................................................................................... 29

              a.  The Jarnagins Accountants Did Not Have Expertise in FBAR Filing Requirements or Any Other International Tax Matters ........................................................................ 29

              b.  The Jarnagins Never Inquired of Their Accountants for Advice on FBARs or Cross-Border Issues ........................... 30

CONCLUSION ................................................................................................................ 33

Appendix A (Selected Statutory and Regulatory Appendix):

    31 U.S.C.

      § 5311 ...................................................................................................... A-1
      § 5314 ...................................................................................................... A-1
      § 5321 ........................................................................................... A-2 – A-5

    31 C.F.R.

      § 103.24 ................................................................................................... A-5
      § 103.27 ......................................................................................... A-5 – A-6
      § 103.56 ......................................................................................... A-6 – A-7

# TABLE OF CONTENTS (Cont.)

Appendix A (Selected Statutory and Regulatory Appendix), cont.:

    Treas. Reg.

        § 1.6664-4 ................................................................................................... A-7 – A-11
        § 301.6651-1 .......................................................................................... A-11 – A-15

Appendix B (Defendant's Exhibits):

| | |
|---|---|
| Exhibit 1: | Plaintiff's Responses to Defendant's First Set of Requests for Admission, Directed to Larry Jarnagin |
| Exhibit 2: | Plaintiff's Responses to Defendant's First Set of Requests for Admission, Directed to Linda Jarnagin |
| Exhibit 3: | Deposition Transcript of Larry Jarnagin |
| Exhibit 4: | Deposition Transcript of Linda Jarnagin |
| Exhibit 5: | Deposition Transcript of Misty Fairchild |
| Exhibit 6: | Deposition Transcript of Kyle Zybach |
| Exhibit 7: | U.S. Individual Income Tax Return (Form 1040) and Schedules for Larry D. Jarnagin and Linda Jarnagin for Tax Year 2006 |
| Exhibit 8: | U.S. Individual Income Tax Return (Form 1040) and Schedules for Larry D. Jarnagin and Linda Jarnagin for Tax Year 2007 |
| Exhibit 9: | U.S. Individual Income Tax Return (Form 1040) and Schedules for Larry D. Jarnagin and Linda Jarnagin for Tax Year 2008 |
| Exhibit 10: | U.S. Individual Income Tax Return (Form 1040) and Schedules for Larry D. Jarnagin and Linda Jarnagin for Tax Year 2009 |
| Exhibit 11: | Financial Statement – Joint, dated December 31, 2006 |
| Exhibit 12: | Financial Statement – Joint, dated December 31, 2007 |
| Exhibit 13: | Financial Statement – Joint, dated December 31, 2008 |
| Exhibit 14: | Wire transfer by Linda Jarnagin from CIBC to EF&A Funding LLC, in the amount of $999,985.00, dated October 7, 2009 |

Appendix B (Defendant's Exhibits), cont.:

Exhibit 15:    Wire transfer by Linda Jarnagin from CIBC to EF&A Funding LLC,
               in the amount of $874,985.00, dated October 7, 2009

Exhibit 16:    Affidavit of Misty Fairchild

Exhibit 17:    Affidavit of Kyle Zybach

Exhibit 18:    Department of the Treasury Form TD F 90-22.1 (Report of Foreign Bank
               and Financial Accounts), revised July 2000 (sample)

Exhibit 19:    Department of the Treasury Form TD F 90-22.1 (Report of Foreign Bank
               and Financial Accounts), revised October 2008 (sample)

Exhibit 20:    Schedules A and B to the U.S. Individual Income Tax Return (Form 1040) for
               Tax Year 2006 (sample)

Exhibit 21:    2006 Instructions for Schedules A and B (Form 1040)

Exhibit 22:    Schedules A and B to the U.S. Individual Income Tax Return (Form 1040) for
               Tax Year 2007 (sample)

Exhibit 23:    2007 Instructions for Schedules A and B (Form 1040)

Exhibit 24:    Schedules A and B to the U.S. Individual Income Tax Return (Form 1040) for
               Tax Year 2008 (sample)

Exhibit 25:    Schedules A and B to the U.S. Individual Income Tax Return (Form 1040) for
               Tax Year 2009 (sample)

Exhibit 26:    2009 Form 1040, Schedule B and Instructions

Exhibit 27:    Summons to Great Plains National Bank (USA-000641–52)

Exhibit 28:    Imposition of non-willful FBAR Penalty for Larry Jarnagin

Exhibit 29:    Imposition of non-willful FBAR Penalty for Linda Jarnagin

Exhibit 30:    Agreement to Assessment and Collection of Penalties Under 31 USC 5321(a)(5)
               and 5321(a)(6) dated November 18, 2015, addressed to Larry D. Jarnagin

Exhibit 31     Agreement to Assessment and Collection of Penalties Under 31 USC 5321(a)(5)
               and 5321(a)(6) dated November 18, 2015, addressed to Linda Jarnagin

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248-249 (1986) ................................................................ 17

*Celotex Corp. v. Catrett*,
477 U.S. 317, 325 (1986) ...................................................................... 17

*Consol. Edison Co. of N.Y., Inc. v. United States*,
221 F.3d 364, 374 (2d Cir. 2000) ......................................................... 27

*David v. Commissioner*,
43 F.3d 788, 789-90 (2d Cir.1995), *aff'd* T.C. Memo. 1993-621 ........... 29

*Estate of Lifton v. United States*,
754 F.3d 975, 979-81 (Fed. Cir. 2014) .................................................. 29

*Freytag v. Commissioner*, 89 T.C. 849, 888 (1987),
*aff'd* 904 F.2d 1011 (5th Cir. 1990), *aff'd* 501 U.S. 868, 888-89 (1991) ............ 29

*Greer v. Commissioner*,
595 F.3d 338, 347 n. 4 (6th Cir. 2010) ................................................. 27

*Gonzales v. United States*,
115 Fed. Cl. 779, 792-93 (2014) .......................................................... 32

*Henningsen v. Commissioner*,
243 F.2d 954, 958-59 (4th Cir. 1957) ................................................... 30

*Howell v. Commissioner*,
175 F.2d 240, 241 (6th Cir. 1949) ........................................................ 28

*Knollwood Mem'l Gardens v. Commissioner*,
46 T.C. 764, 795 (1966) ...................................................................... 31

*Linmar Prop. Mgmt. Trust v. Commissioner*,
T.C. Memo. 2008-219, 2008 WL 4366069 at *11 (2008) ...................... 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 587 (1986) ...................................................................... 17

*Moore v. United States*,
No. C13–2063RAJ, 2015 WL 1510007 (W.D. Wash. April 1, 2015) ......... 20, 27

# TABLE OF AUTHORITIES (Cont.)

**Cases (cont.):**

*N.Y. State Ass'n of Real Estate Bds. Grp. Ins. Fund v. Commissioner*,
   54 T.C. 1325, 1336 (1970) ...............................................................................31

*Neonatology Assocs., P.A. v. Commissioner*,
   115 T.C. 43, 100 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). .............................. 32

*Richardson v. Commissioner*,
   125 F.3d 551 , 558 (7th Cir. 1997) ....................................................................... 32

*Russian Recovery Fund Ltd. v. United States*, 122 Fed. Cl. 600, 623 (2015)
   *aff'd* Nos. 2016-1718, 2016-1719, slip op. at 27 (Fed. Cir. March 14, 2017) ................... 31

*United States v. Boyle*,
   469 U.S. 241, 248 (1985) ..................................................................... *passim*

*United States v. Hom*,
   45 F. Supp. 3d 1175, 1178 (N.D. Cal. 2014) ....................................................... 20

*United States v. McBride*,
   908 F. Supp. 2d & n.3 .......................................................................... 24, 27, 28

*United States v. Williams*,
   489 Fed. App'x 655, 659 (4th Cir. 2012) ........................................................... 27

# TABLE OF AUTHORITIES (Cont.)

**Statutes:**

26 U.S.C. (Internal Revenue Code of 1986)

§ 1031 ................................................................................................................ 6
§ 6651 ............................................................................................. 20, 21, 32, 33

28 U.S.C.

§ 1491................................................................................................................17

31 U.S.C.

§ 5311 ............................................................................................................... 18
§ 5314................................................................................................................ 1, 18
§ 5321 .......................................................................................................... *passim*

**Regulations:**

31 C.F.R.

§ 103.24 ............................................................................................... 1, 18, 20, 24
§ 103.27 ............................................................................................................. 18
§ 103.56 ............................................................................................................. 19
§ 1010.350.......................................................................................................... 1
§ 1010.810 ..........................................................................................................19

Treas. Reg.

§ 1.6012-1 .......................................................................................................... 28
§ 1.6664-4 .................................................................................................... 26, 29
§ 301.6651-1 ...............................................................................................21, 23, 26

**Miscellaneous:**

59 Okl. St. Ann. §§ 858-363 ............................................................................... 5

1970 U.S.C.C.A.N. 4394 ..................................................................................... 18

2004 U.S.C.C.A.N. 1341 ..................................................................................... 23

H.R. Rep. No. 91-975 (1970).............................................................................. 18

H.R. Rep. 108- 755, at 615 (2004) (Conf. Rep.)................................................21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
_____

No. 15-1534 T
(Judge Elaine D. Kaplan)

LARRY D. JARNAGIN AND
LINDA JARNAGIN

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

_____

**MOTION OF THE UNITED STATES
FOR SUMMARY JUDGMENT**

_____

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, moves for summary judgment in defendant's favor on the grounds that there are no genuine issues as to any material fact and defendant is entitled to judgment as a matter of law. As more specifically set forth below in our accompanying brief, the government is entitled to judgment as a matter of law because plaintiffs' failure to file FBAR returns pursuant to 31 U.S.C. § 5314 does not meet the requirements of the the reasonable cause exception under 31 U.S.C. § 5321(a)(5)(B)(ii).

In support of this motion, defendant relies upon the pleadings, the accompanying brief, and the attached exhibits.

Respectfully submitted,

_____3/24/2017_____                    _/s/ Jason S. Selmont_____
Date                                   JASON S. SELMONT
                                       U.S. Department of Justice
                                       Tax Division
                                       Court of Federal Claims Section
                                       Ben Franklin Station, PO Box 26
                                       Washington, D.C. 20044
                                       Tel:  (202) 616-3338
                                       Fax:  (202) 514-9440
                                       jason.s.selmont@usdoj.gov

                                       DAVID A. HUBBERT
                                       Acting Assistant Attorney General
                                       DAVID I. PINCUS
                                       Chief, Court of Federal Claims Section
                                       BLAINE G. SAITO
                                       Trial Attorney


                                       _/s/ David I. Pincus_____
                                       Of Counsel

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
_____

No. 15-1534 T
(Judge Elaine D. Kaplan)

LARRY D. JARNAGIN AND
LINDA JARNAGIN

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

_____

**BRIEF IN SUPPORT OF THE MOTION OF
THE UNITED STATES FOR SUMMARY JUDGMENT**
_____

## INTRODUCTION

Each year, U.S. citizens who hold a financial account in a foreign country are required to report the account to the Treasury Department. *See* 31 U.S.C. § 5314; 31 C.F.R. § 103.24 (2009).[1] *Holding* such an account is not illegal, but failing to report it can lead to a civil monetary penalty. The form on which the report is made is the Report of Foreign Bank and Financial Account, often abbreviated FBAR—and the penalty for failing to file it is known as "the FBAR penalty." Unless the failure to report the account is willful, the amount of the penalty is capped at $10,000 per violation. It is that "non-willful" penalty that is at issue here.

Plaintiffs Larry and Linda Jarnagin held millions of dollars in a foreign bank account at the Canadian Imperial Bank of Commerce ("CIBC") during the four years at issue in this case

---

[1] In 2010, the regulations were updated and relocated to 31 C.F.R. § 1010.350. The United States refers in this Brief to the regulations effective in 2006-2009.

(2006-2009), but neither one of them filed an FBAR for any of those years, even though they had an obligation to do so. Moreover, the filing requirement is set forth on the federal income tax returns, and plaintiffs did file returns for all of those years.

Indeed, only after auditing plaintiffs' income tax returns did the Internal Revenue Service discover that plaintiffs had a foreign bank account at CIBC. As plaintiffs never reported that account, the Internal Revenue Service assessed FBAR penalties against each plaintiff for each year they failed to report it, for a total of $80,000—four penalties of $10,000 each against Mr. Jarnagin and four penalties of $10,000 each against Mrs. Jarnagin.

Plaintiffs admit that they were required to file FBARs for the years at issue and that they failed to do so then and failed to do so since then. Nonetheless, they contend that they are not liable for the statutory penalties that would otherwise attach to that failure by arguing that their non-disclosure was due to reasonable cause. But, plaintiffs are ill-positioned to establish this defense. For one thing, plaintiffs never reviewed their income tax returns, which would have put them on notice of the requirement to file FBARs. Moreover, their claimed reliance on their accountants was unreasonable, as plaintiffs never inquired into their accountants' experience with international compliance. In fact, if plaintiffs had simply asked this question, they would have learned that their accountants had *no* experience with international tax compliance.

After an overview of the uncontroverted facts, the United States explains in detail the statutory and regulatory scheme for the penalties before discussing the substance of the case. When the correct standards are applied, it is clear that there are no genuine disputes of material fact, and that the United States is entitled to judgment as a matter of law.

## QUESTIONS PRESENTED

1.      Are plaintiffs liable for a penalty for the non-willful FBAR penalty (putting aside the "reasonable cause" defense)?

2.      If plaintiffs are otherwise liable for the non-willful FBAR penalty, would

plaintiffs be able to establish the requirements of the "reasonable cause" defense?

**FACTS**

The material facts in this case are undisputed. Plaintiffs Larry D. and Linda Jarnagin are

both U.S. citizens residing in Oklahoma. (Compl. ¶ 6.) Mr. Jarnagin is also a Canadian citizen

who resides in Canada for part of the year. (Compl. ¶ 6; Larry Tr. Ex. 3 at 19:3; Ex. 16 ¶ 6.)[2]

The Jarnagins, through their numerous successful business ventures, amassed significant wealth,

some of which they held in a foreign bank account. For each of the four years at issue—2006,

2007, 2008, and 2009—they had ownership and control of at least one bank account at CIBC

with a balance over $10,000 (Ex. 1; Ex. 2; Larry Tr. Ex. 4 at 26:14–20) triggering the

requirement for plaintiffs to file FBARs. *Plaintiffs never timely filed FBARs for the years at*

*issue (Ex. 1; Ex. 2) and still have not done so to this day.* Plaintiffs also never reported any

income from the accounts held at CIBC on the Schedule B of their tax returns for the relevant

years. (*See* Ex. 7 at 5; Ex. 8 at 8; Ex. 9 at 4; Ex. 10 at 4, 18.)

Additionally, for each year at issue, plaintiffs signed, either physically or electronically,

their U.S. tax returns, and for each year, their response to the question on line 7a of Part III on

Schedule B, which asked whether they had ownership or control over foreign bank accounts, was

"No." (Ex. 7 at 5; Ex. 8 at 8; Ex. 9 at 4; Ex. 10 at 4.) This was false. (*See* Ex. 1; Ex. 2; Larry

Tr. Ex. 4 at 26:14-20.) In their depositions, plaintiffs stated that they never reviewed their

---

[2] References to defendant's exhibits in the record use the page numbers stamped on the exhibit.
Thus, Ex. 1 at 2 corresponds to the page numbered Def. Ex. 1 - 002. The exceptions are the
deposition transcripts, which are exhibit numbers 3, 4, 5, and 6, and the affidavits of Ms.
Fairchild and Mr. Zybach, which are exhibit numbers 16 and 17. The deposition transcripts use
the page and line numbers of the transcript. The affidavits use paragraph numbers of the
affidavit.

returns prior to filing them.  (Larry Tr. Ex. 3 at 57:16–17, 57:24; *see also id.* at 56:25–57:25;
Linda Tr. Ex. 4 at 48:14–18, 49:12–19, 51:8–18, 52:23–53:18, 54:21–55:1, 58:5–59:4, 63:16–
64:22.)

## I.  The Plaintiffs' Background.

Both Mr. and Mrs. Jarnagin have had extensive and successful business dealings in
complex and risky sectors, most notably oil and gas and real estate.  Their numerous ventures
allowed them to amass a net worth of about $30 million for the years at issue in this case. (Ex. 11
at 1; Ex. 12 at 1; Ex. 13 at 1.)  The background of each of the Jarnagins, which shows their
business savvy, is described in turn.

### A.  Larry Jarnagin.

Mr. Jarnagin obtained significant wealth from the following American and Canadian
business enterprises: Mr. Jarnagin's first business venture stemmed from his training as a barber.
(Larry Tr. Ex. 3 at 13:2–5.)  He started cutting hair, and eventually built a small business empire,
owning and operating several barbershops in New Mexico. (*Id.* at 13:6–8.)  While barbering and
running this chain of shops, he also trained and then practiced as a chiropractor in New Mexico.
(*Id.* at 10:16–7.)  He eventually sold his stake in the chain of barbershops in the 1980s. (*Id.* at
15:11–18.)

After moving to Oklahoma in 1971, Mr. Jarnagin gave up practicing as a chiropractor,
because he did not have a license in Oklahoma.  (*Id.* at 13:9–14.)  He instead started farming,
focusing mainly on cattle and wheat.  (*Id.* at 13:9–14, 15:1–3.)  Even as a farmer, Mr. Jarnagin
sought growth opportunities, by purchasing other farms to expand his farming and ranching
holdings.  (*Id.* at 13:12–14.)

The expansion of his farming and ranching holdings whetted Mr. Jarnagin's appetite to
enter into another sector, real estate.  (*Id.* at 16:19–25, 17:6–15.)  Mr. Jarnagin's real estate

ventures involved property trading. (*Id.* at 17:7–9.) In these ventures, he often partnered with other investors, and gained experience in the formation and operation of various types of businesses entities. (*Id.* at 17:16–23.)

The discovery of oil on some of his property in Western Oklahoma and an oil boom in the 1970s led Mr. Jarnagin to get involved in the risky and complex oil business. (*Id.* at 16:8–10.) His main ventures in this sector involved the leasing of mineral rights, the purchase of minerals, and the resales of leases. (*Id.*) Due to unfavorable changes in market prices, Mr. Jarnagin exited the oil business in the 1980s to expand into other ventures. (*Id.* at 20:6–15.)

The oil business took Mr. Jarnagin to Canada. (*Id.* at 18:4–9, 18:20–24.) Mr. Jarnagin eventually moved to Canada in 1986 and became a Canadian citizen in 1989. (*Id.* at 18:18:25–19:3.) In Canada, Mr. Jarnagin also sought to profit from business ventures. With some Canadian partners, he bought property and built rental developments. (*Id.* at 18:5–14.) At some point in the 1990s, he sold those properties and bought a large ranch in British Columbia that he continues to operate today. (*Id.* at 18:17–19, 19:4–7.) He continues to spend a significant part of the year on that ranch in British Columbia. (Larry Tr. Ex. 3 at 23:3; Ex. 16 ¶ 6.)

### B. Linda Jarnagin.

Like her husband, Mrs. Jarnagin has a similar story of building successful business ventures. Through her numerous real estate dealings, Mrs. Jarnagin also developed significant business savvy.

Mrs. Jarnagin's experience in real estate started about 1978, when she received a real estate sales associate license. (Linda Tr. Ex. 4 at 10:20–11:7.) She proved adept at this business, and about two years later, she received a real estate broker's license in Oklahoma, which allowed her to act as a realtor on her own and supervise sales associates. (*Id.* at 9:17–22; *see* 59 Okl. St. Ann. § 858-363 (stating that a sale associate must be associated with a real estate broker and may

not enter into any brokerage agreement except in the name of the broker), and § 858-305 (allowing a full real estate broker to license an association or corporation for real estate brokerage services).) Mrs. Jarnagin worked as a broker until about 1982, when she paused her career to raise her children. (Linda Tr. Ex. 4 at 14:22–15:20, 16:11–15.)

After the children grew up, about 1990, Mrs. Jarnagin re-entered the real estate business and started building her small empire in earnest by purchasing her first apartment complex in Elk City, Oklahoma. (*Id.* at 17:18–24.) By 1992, she had four complexes in Elk City, and she expanded her business to another city through a purchase of an apartment complex in Lawton, Oklahoma. (*Id.* 18:14–16.) In 2002, she bought an additional apartment complex, for a total of six complexes under her ownership and control. (*Id.* at 18:17–19.) Mrs. Jarnagin managed the complexes during the period of ownership with the assistance of on-site property managers. (*Id.* at 18:3–13.)

Just prior to the housing market collapse, Mrs. Jarnagin began disposing of the apartment complexes. In 2006, Mrs. Jarnagin's sophistication in tax matters allowed her to structure the swap of an apartment complex for a business plaza in Oklahoma City (that she still has today) as a tax-free like-kind exchange under I.R.C. § 1031. (*Id.* at 18:23–24, 19:8–16, 43:18–44:22.) She sold of the remaining complexes over the course of 2010 to 2016. (*Id.* at 19:2–5.) With the exception of the I.R.C. § 1031 transaction, Mrs. Jarnagin disposed of these properties at a gain. (*Id.* at 19:17–21.) (The management and disposition of the apartment complexes, and the use of the like-kind exchange provision, a complex tax provision in the real estate business, show Mrs. Jarnagin's significant business acumen.)

Mrs. Jarnagin's business shrewdness also aided in the ownership and management of a nightclub in Phoenix, Arizona. She obtained ownership of the club about 1999, as the result of a

bankruptcy by a debtor.  (*Id.* at 19:22–20:12.)  Mrs. Jarnagin's stated goal was to operate the

nightclub to recoup some of the funds that she had lent to the previous owners who went

bankrupt.  (*Id.* at 21:17–19.)  She hired and oversaw managers who in turn operated the club.

(*Id.* at 21:2–19.)  She kept it solvent, recouping some of the funds she had lent.  (*Id.* at 20:15–

23.)  The City of Phoenix then purchased the property in an exercise of eminent domain, ending

Mrs. Jarnagin's nightclub venture.  (*Id.* at 22:2–10.)

## II.     The Jarnagins' Return Preparation.

Plaintiffs' general process for filing their returns was that plaintiffs, in conjunction with

their bookkeepers, would gather information about their businesses and personal matters.

(Fairchild Tr. Ex. 5 at 32:14–35:21, Ex. 16 ¶ 8.)  The bookkeepers would then compile this

information into a form that the U.S. return preparers could use.  (*Id.*)  The Jarnagins provided a

stack of documents to the return preparers without much discussion.  ("Q: So you would just

hand him just say a box of documents or boxes of documents for the preparation of the return?

A: I believe that's what we did." Linda Tr. Ex. 4 at 45:8–11; *see also* Larry Tr. Ex. 3 at 44:18–

20, 56:25–57:17;Linda Tr. Ex. 4 at 42:16–43:6, 44:22–45:11, 45:12–46:3.)  Thus, the process

essentially involved plaintiffs handing over numerous pieces of information and documents to

the U.S. return preparers with minimal engagement.

In addition to preparing their returns, plaintiffs tasked the U.S. return preparers with

providing copies of the returns to the Jarnagins' Canadian accountants so that the Canadian

accountants could timely file the Jarnagins' Canadian tax returns. (Fairchild Tr. Ex. 5 at 46:8–

13.)  During the process of preparing the U.S. returns, neither plaintiff, according to Mrs.

Jarnagin, had any substantive discussions with the U.S. return preparers.  (Linda Tr. Ex. 4 at

42:16–43:14.)  In the finalization, Mrs. Jarnagin would usually show up at the return preparers'

offices to sign the return.  According to their depositions, neither plaintiff ever undertook any

level of substantive review prior to signing and filing the return. Plaintiffs admit to usually only asking "'What's the bottom line?'" or "'How much money?'" (Larry Tr. Ex. 3 at 57:16–17, 57:24; *see also id.* at 56:25–57:25; Linda Tr. Ex. 4 at 48:14–18, 49:12–19, 51:8–18, 52:23–53:18, 54:21–55:1, 58:5–59:4, 63:16–64:22.)

Schedule B to the individual income tax return (Form 1040) included a "yes" or "no" question in line 7a in Part III of Schedule B for all of the years 2006 through 2009. That question asked, "At any time during [the appropriate year], did you have an interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" (Ex. 20 at 2; Ex. 22 at 2; Ex. 24 at 2; Ex. 26 at 1.) The question on the Schedule B also referred the taxpayer to the instructions to determine whether he or she fit within any exceptions, and these instructions said that a taxpayer should check the "Yes" box for line 7a if either:

1. You owe more than 50% of the stock in any corporation that owns one or more foreign bank accounts.

2. At any time during 2009 you had an interest in or signature authority over a financial account in a foreign country (such as a bank account, securities account, or other financial accounts.

(Ex. 21 at 9; Ex. 23 at 15; Ex. 25 at 15; Ex. 26 at 2). The instructions also continued:

See Form TD F 90-22.1 to find out if you are considered to have an interest in or signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account). . . .

*If you checked the "Yes" box on line 7a, file Form TD F 90-22.1 by June 30, [of the following year] with the Department of the Treasury at the address shown on that form.*

(*Id.*) (emphasis added). The instructions for Form TD F 90-22.1 likewise stated:

**Who must file this Report.** Each United States person who has a financial interest in or signature authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of the foreign financial account exceeds $10,000 at any time during the calendar year. . . .

**Financial Interest.** A financial interest in a bank, securities, or other financial account in a foreign country means an interest described in one of the following three paragraphs:

1. A United States person has a financial interest in each account for which such person is the owner of record or has legal title, whether the account is maintained for his or her own benefit or for the benefit of others including non-United States persons.

(Ex. 19 at 6; *see also* Ex. 18 at 4 (similar language).)

The government now turns to the Jarnagins' bookkeeper and return preparers to provide an overview of their experience and relationships with the Jarnagins.

### A. Misty Fairchild.

Plaintiffs' bookkeeper and one of their current accountants, Misty (Zybach) Fairchild, has a relationship with the Jarnagins reaching back many years. Mrs. Jarnagin hired Ms. Fairchild in 1997, based on a relationship that Mrs. Jarnagin had with Ms. Fairchild's mother. (Linda Tr. Ex. 4 at 25:9–10, 25:9–16; Fairchild Tr. Ex. 5 at 11:15–12:10.) In the course of this relationship, Ms. Fairchild served as the key liaison between plaintiffs and their return preparers and she became thoroughly familiar with the Jarnagins' business affairs.

Ms. Fairchild initially worked part-time and became a full-time bookkeeper after about six months. (Fairchild Tr. Ex. 5 at 12:4–12:17.) During the course of her work, Ms. Fairchild would interact directly with Mrs. Jarnagin on an almost daily basis. (*Id.* at 28:6–9.) Ms. Fairchild became aware of the daily operations of the Jarnagins' real estate business—including the financial operations. (*Id.* at 12:18–14:24.) Mrs. Jarnagin placed a great deal of trust and confidence in Ms. Fairchild. When issues arose regarding the management and the bookkeeping involving the Phoenix nightclub, Mrs. Jarnagin relied upon Ms. Fairchild to establish the bookkeeping systems. (Linda Tr. Ex. 4 at 21:20–23.)

As the bookkeeper, Ms. Fairchild prepared the financial reports, like balance sheets, statements of net worth, and income statements; made bank deposits; wrote checks; and assisted

in other day-to-day management activities of the apartments owned by plaintiffs in Oklahoma. (Fairchild Tr. Ex. 5 at 13:5–22, 13:23–14:6.)  In addition, while she served as the bookkeeper, every year for tax preparation, she would gather information and generate materials for the U.S. tax returns, such as the financials of the various LLCs related to the properties owned by plaintiffs and the preparation of various financial statements, which she would then hand over to the return preparers.  (*Id.* at 32:5–33:19.)  Ms. Fairchild knew that plaintiffs had Canadian accountants and Canadian bank accounts, but she had limited contact with these accountants and no responsibility for the bank accounts while she served as a bookkeeper. (*Id.* at 44:25–45:1, 46:8–47:6, 51:24–53:1.)

Ms. Fairchild also pursued an education while working as a bookkeeper for the Jarnagins. She received a bachelor's degree in accounting and finance, graduating in 1998.  (*Id.* at 9:2–13.) She then obtained an MBA in 2000 (*id.* at 9:17–19) and her CPA license in 2002.  (*Id.* at 10:1–9.)  During her education, Ms. Fairchild never took a class related to international tax, and over the course of her career, she did not deal with any international tax issues, such as filing income tax returns for non-residents, returns with foreign source income, or returns for dual citizens. (*Id.* at 66:7–8.)  The Jarnagins never asked her whether she had such foreign tax related experience during the course of their relationship with her.  (*Id.* at 67:20–68:7.)

Ms. Fairchild left full-time employment with the Jarnagins in 2004 first to work at Interbank until about 2007 (*id.* at 15:12–14, 19:10–20:19), and then at Great Plains National Bank.  (*Id.*)  At neither bank did Ms. Fairchild have exposure to or gain experience in international tax issues during her six years of employment.  (*Id.* at 19:4–9, 23:5–11.)

But, even though the banks were her employer, Ms. Fairchild still maintained a strong connection to Mrs. Jarnagin.  She served as a bookkeeping consultant in her spare time for Mrs.

Jarnagin's real estate holdings.  (*Id.* at 24:8–25:11.)  The amount of time she spent as this consultant varied, and when the actual bookkeeper for Mrs. Jarnagin proved incapable, Ms. Fairchild would step back in and do almost all of the bookkeeping tasks.  (*Id.*)

The relationship came full circle again in 2010 when Ms. Fairchild left the banking world and joined an accounting firm started by her brother, Kyle Zybach.  (*Id.* at 23:12–21.)  Ms. Fairchild then worked with Mr. Zybach to prepare plaintiffs' U.S. tax returns.  (Fairchild Tr. Ex. 5 at 47:25–48:21; Ex. 16 ¶ 17.)  Once again, during this time, according to Ms. Fairchild, she had little or no contact with the Canadian accountants other than to transmit the U.S. tax returns to the Canadian accountants so that they could file Mr. Jarnagin's Canadian tax returns.  (Fairchild Tr. Ex. 5 at 51:24–53:1.)

At no point in the relationship did plaintiffs ever asked Ms. Fairchild about her background regarding international tax.  (*Id.* at 67:20–68:7.)  Ms. Fairchild assumed that the Canadian accountants managed all international tax issues, including the filing of FBARs. According to Ms. Fairchild, she learned of the FBAR requirement and her mistake only in 2011. (*Id.* at 53:2–22; 70:5–71:2.)

> **B.  The Jarnagins' U.S. Return Preparers.**
>
> **1.  Crook's Accounting Service.**

For many years, plaintiffs engaged James Crook to prepare their U.S. tax returns.  (Larry Tr. Ex. 3 at 42:25–43:11; Linda Tr. Ex. 4 at 32:1–15; Ex. 16 ¶ 8.)  Mr. Crook ran his own firm, Crook's Accounting Services.  Despite having engaged Mr. Crook for numerous tax years, plaintiffs' only knowledge of Mr. Crook's experience was that he was allegedly a CPA and a former IRS agent, who participated in the audits of large companies like McDonnell Douglass. The Jarnagins, according to their deposition testimony, never inquired into the qualifications of

Mr. Crook and his associates, and never inquired into Mr. Crook's experience in international tax compliance. (Larry Tr. Ex. 3 at 43:17–44:7; Linda Tr. Ex. 4 at 32:21–33:10.)

As stated above, it was plaintiffs' bookkeeper, Ms. Fairchild, who provided to Mr. Crook all of the information necessary to complete the returns. (Fairchild Tr. Ex. 5 at 32:14–35:4; Ex. 16 ¶ 8.) Mr. Crook prepared plaintiffs' returns and then sent copies of the returns to the Canadian accountants for the preparation of the Jarnagins' Canadian tax returns. (Ex. 16 ¶ 11.) The communications appeared to be "one way." Mr. Crook and Ms. Fairchild would transmit information to the Canadian accountants, but the Canadian accountants never transmitted information back. According to the Jarnagins and Ms. Fairchild, Mr. Crook never had substantive discussions with the Canadian accountants. (Larry Tr. Ex. 3 at 44:13–45:11; Linda Tr. Ex. 4 at 36:24–37:7; Fairchild Tr. Ex. 5 at 51:24–53:5.)

Every year, after Mr. Crook prepared the return, Mrs. Jarnagin would sign the return, and Mr. Crook would file it.[3] (Linda Tr. Ex. 4 at 50:19–51:4, 52:11–18.) According to their deposition testimony, neither Mr. nor Mrs. Jarnagin substantively reviewed the return before signing it; they only asked what the amount of tax owed was. (*Id.* at 48:14–18, 49:12–19, 51:8–18, 52:23–53:18, 54:21–55:1.)

In about 2005, Mr. Crook died.[4] (Ex. 16 ¶ 8.) Mike Gordon, who also worked at Crook's Accounting Service, took over the preparation of plaintiffs' returns.[5] (*Id.* at ¶ 15)

---

[3] Ms. Jarnagin signed as the Power of Attorney for her husband for both 2006 and 2007. (Linda Tr. Ex. 4 50:19–51:4, 52:5–52:18.)

[4] Because Mr. Crook died in 2005, he would not have prepared the FBARs for any of the years at issue.

Plaintiffs knew nothing about Mr. Gordon's qualifications other than the fact that he was a CPA. (Larry Tr. Ex. 3 at 59:11–19; Linda Tr. Ex. 4 at 34:11–35:15.) The Jarnagins never determined whether Mr. Gordon had any experience in international tax issues. (*Id.*) Mr. Gordon followed the same procedures as Mr. Crook did in filing the returns, and the plaintiffs, according to Mrs. Jarnagin's deposition, signed and filed without performing a substantive review of the return, instead asking only about the amount of tax owed. (Linda Tr. Ex. 4 at 59:19–15:4, 52:11–18.)

In 2008, Mr. Gordon died. (Fairchild Tr. Ex. 5 at 44:6–7; Zybach Tr. Ex. 6 at 15:20–16:4, 20:5–11.) This precipitated a change in preparers, and Ms. Fairchild recommended her brother, Kyle Zybach, who had started his own accounting firm, to undertake the preparation of the 2008 taxable year returns. (Fairchild Tr. Ex. 5 at 42:2–43:9.)

## 2. Kyle Zybach.

Mr. Zybach has had a personal and professional relationship with the Jarnagins dating back to the 1990s. Mr. Zybach, Ms. Fairchild's brother, has had a professional relationship with the Jarnagins since approximately 1999 when, during his college years, he worked part-time for the Jarnagins under the supervision of his sister, the Jarnagins' bookkeeper. (Zybach Tr. Ex. 6 at 13:6–12.)

Mr. Zybach received a bachelor's degree in accounting in 2001 and an MBA in 2003. (*Id.* at 7:22–8:11.) He received his CPA license in Oklahoma in 2002. (*Id.* at 9:1–7.) According to Mr. Zybach, none of the classes he took involved any international tax issues. (*Id.* at 45:4–

---

(…continued)

[5] Although not material to this case, for some reason, Mr. Crook's widow continued to sign the returns as the return preparer through the filing of the 2007 taxable year return, despite Mr. Gordon having prepared the returns. (Ex. 7 at 3; Ex. 8 at 3.)

17.)  After receiving his degree, Mr. Zybach worked at accounting firms in Oklahoma, but while there did not perform any tasks related to international tax issues. (*Id.* at 10:9–11, 11:2–4.)

In 2007, Mr. Zybach started his own accounting firm, and in 2010, his sister Ms. Fairchild joined as his partner. (*Id.* at 11:5–18.)  Other than the Jarnagins, Mr. Zybach did not have any clients who were citizens or residents of another country or who received foreign source income.  (*Id.* at 35:4–16, 36:8–17.)  In fact, Mr. Zybach said that prior to 2011, he had no knowledge on international tax issues or foreign filings, and he did not undertake any research involving those issues.  (*Id.* at 35:24–36:5.)  At no point during his engagement with plaintiffs did plaintiffs ask him about his familiarity with foreign tax issues.  (*Id.* at 37:20–23.)  Nor did Mr. Zybach tell plaintiffs that he had no knowledge or experience with international tax issues. (*Id.* at 37:24–38:4.)

According to Mr. Zybach, he had little contact or understanding as to role of the Canadian accountants, other than the fact that they prepared the Canadian tax returns.  (*Id.* at 18:23–20:1.)  Similar to the practice with Crook's Accounting Service, Mr. Zybach, with Ms. Fairchild's assistance, would gather the necessary information from plaintiffs, prepare the U.S. returns, and then send the U.S. returns to the Canadian accountants. (*Id.* at 19:4–7.)  Other than filing the Canadian tax returns, Mr. Zybach did not know what the Canadian accountants did. (*Id.* at 18:23–19:7.)  Mr. Zybach did not receive any information from the Canadian accountants or inquire as to why he received nothing from them.  (*Id.* at 19:18–20:1.)  He did not have sustained contact or substantive discussions with the Canadian accountants.  (*Id.* at 19:18–20:1.) Instead, Mr. Zybach just assumed that the Canadian accountants handled any international or foreign tax issues matters.  (Zybach Tr. Ex. 6 at 18:23–19:7, 30:1–7; Ex. 17 ¶ 16.)  In essence,

Mr. Zybach continued the practice of merely shuttling information to the Canadian accountants while they said nothing in return.

Mr. Zybach used tax preparation software to assist in the preparation of the Jarnagins' tax returns. (Zybach Tr. Ex. 6 at 24:23–25:11; Ex. 17 ¶ 12.)  For the years 2008 and 2009, Mr. Zybach, in his deposition, stated that the software did not have a separate screen for the question to call particular attention to questions on whether the taxpayers had foreign bank accounts. (Zybach Tr. Ex. 6 at 26:3–16.)  However, as Mr. Zybach testified, questions regarding foreign accounts did appear on each screen in which Mr. Zybach would type in plaintiffs' interest and dividend income.  (*Id.*)  The fact that, in the tax software, questions regarding the foreign accounts were on the same screen as the dividend and interest inputs certainly aligns with the structure of the returns themselves (*i.e.*, dividends and income are reported on Schedule B, Parts I & II and foreign accounts are reports on the same page at Schedule B, Part III).  In his review of the return in general, and Schedule B in particular, Mr. Zybach only reviewed the dividend and income numbers on Schedule B, and did not take the time to look at the simple "yes" or "no" questions in Part III.  (*Id.* at 27:8–28:2.)

In November 2010, Mr. Zybach and Ms. Fairchild attended a continuing education program.  (Zybach Tr. Ex. 6 at 29:2–23; Ex. 17 ¶ 14.)  At this program, they learned about the requirements to file an FBAR.  (*Id.*)  Subsequent to this program, Mr. Zybach and Ms. Fairchild asked the Canadian accountants: who filed these forms for the Jarnagins?  They found out through plaintiffs that the Canadian accountants never filed FBARs.  (Zybach Tr. Ex. 6 at 30:12–18.)  Mr. Zybach and Ms. Fairchild determined that the plaintiffs were required to file FBARs and advised the Jarnagins of that requirement. (*Id.* at 30:19–31.)  But, neither plaintiffs nor Mr.

Zybach or Ms. Fairchild ever filed delinquent FBARs for the previous years.  The IRS only later uncovered the lack of FBARs in an audit of plaintiffs.

**III.    The IRS Examination.**

In 2011, the IRS selected plaintiffs' 2008 and 2009 U.S. income tax returns for audit (the "Title 26 audit").  During the course of the Title 26 audit, the IRS discovered two wire transfers, dated October 7, 2009, of $999,985.00 and $874,985.00 originating from a bank account at CIBC held by Mr. Jarnagin.  (Ex. 14; Ex. 15.)  Plaintiffs used the funds transferred from CIBC to pay a mortgage on one of the apartment complexes owned by Mrs. Jarnagin in Lawton, Oklahoma.  (Linda Tr. Ex. 4 at 76:3–9, 78:9–20.)  Given the fact that plaintiffs' responded "no" to the question on Schedule B that asked whether they owned or controlled any foreign bank accounts for these taxable years, the IRS sought an explanation.

The IRS issued a summons to Great Plains National Bank, a U.S. bank located in Elk City, Oklahoma, for plaintiffs' records.  (Ex. 27.)  In response to the summons, Great Plains provided records that contained plaintiffs' personal financial statements for 2006, 2007, and 2008.  (Ex. 11; Ex. 12; Ex. 13.)  In each of these years, they stated that they had a CD/Savings account at CIBC with a balance of $4,000,000.00, $3,500,000.00, and $3,860,000.00, as of December 31, 2006, December 31, 2007, and December 31, 2008 respectively.  (Ex. 11 at 2; Ex. 12 at 2; Ex. 13 at 2)  Plaintiffs explained that they submitted these statements every year to Great Plains in accordance with the terms of a loan they had from the bank.  (Linda Tr. Ex. 4 at 67:1–4.)  Ms. Fairchild prepared these statements, and plaintiffs signed each of them. (Linda Tr. Ex. 4 at 66:23–67:13, 69:23–70:13, 72:20–73:6; Fairchild Tr. Ex. 5 at 73:22–74:17, 76:18–25; Ex. 11; Ex. 12; Ex. 13.)

Based on this information, the IRS opened an examination for failure to file FBARs (the "Title 31 examination") for the plaintiffs.  During the course of the Title 31 examination, the IRS

determined that the Jarnagins were required to file FBARs for years 2006-2010, but failed to do so. Accordingly, the IRS imposed a non-willful FBAR penalty, pursuant to 31 U.S.C. § 5321(a)(5)(B), of $10,000 for Mr. Jarnagin, and $10,000 for Mrs. Jarnagin for each of the years 2006, 2007, 2008, 2009, and 2010. (Ex. 28; Ex. 29.)

Plaintiffs then contested the non-willful FBAR penalties before the IRS Office of Appeals. The Office of Appeals sustained the 2006 through 2009 non-willful FBAR penalties, but conceded the 2010 penalty. (Ex. 30; Ex. 31.) Plaintiffs paid the amount of the penalties for the years 2006 through 2009, which totaled $80,000, and filed suit in this Court seeking a refund of the penalties paid.

## SUBJECT MATTER JURISDICTION

Subject matter jurisdiction in this case is conferred on this Court by 28 U.S.C. § 1491.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Rules of the Court of Federal Claims ("RCFC" or "Rules") permits summary judgment if no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The movant must initially show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A fact is material if it affects the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is not genuine if, were the case to go to trial, no rational trier of fact could find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant may satisfy its burden by showing an absence of evidence supporting the nonmoving party's case. *Celotex*, 477 U.S. at 325. The Court then functions "not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**ARGUMENT**

**I.      Statutory and Regulatory Framework for the FBAR Penalty.**

The legal background of (1) the requirement to report foreign financial accounts, and (2) the reasonable cause defense are as follows:

**A.  The Requirement to Report Foreign Financial Accounts.**

The requirement to report interests in foreign bank accounts arises under the Bank Secrecy Act, codified at 31 U.S.C. §§ 5311 *et seq*., which was designed in part as a means to combat tax evasion.  *See* H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397-98 (observing that "[s]ecret foreign financial facilities, particularly in Switzerland" offered the wealthy a "grossly unfair" but "convenient avenue of tax evasion").

31 U.S.C. § 5314 instructs the Secretary of the Treasury to require U.S. citizens to keep records, file reports, or both, when the citizen "makes a transaction or maintains a relation . . . with a foreign financial agency." 31 U.S.C. § 5314(a).  In turn, the Secretary published regulations requiring any citizen "having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country" to report certain details about the account to the Treasury Department.  31 C.F.R. § 103.24 (2009).  The report must be made each year by filing a form with the Treasury Department no later than June 30 of the following year.  *See* 31 C.F.R. § 103.27(c), (d), (e) (2009).

To alert citizens to the filing requirement, Schedule B of each year's Form 1040 contains the following check-the-box question:

18

| | You must complete this part if you **(a)** had over $1,500 of taxable interest or ordinary dividends; **(b)** had a foreign account; or **(c)** received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | Yes | No |
|---|---|---|---|
| **Part III Foreign Accounts and Trusts** (See instructions on back.) | **7a** At any time during 2016, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions . . . . . . . . . | | |
| | If "Yes," are you required to file FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR), to report that financial interest or signature authority? See FinCEN Form 114 and its instructions for filing requirements and exceptions to those requirements . . . . . . | | |
| | **b** If you are required to file FinCEN Form 114, enter the name of the foreign country where the financial account is located ▶ | | |
| | **8** During 2016, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See instructions on back . . . . . . | | |

(Ex. 26 at 1; *see also, e.g.*, Ex. 10 at 4 (2009 return).)  The instructions for Schedule B for Form 1040 require the filer to check "Yes" on Line 7a if the filer "had a financial interest in or signature authority over a financial account located in a foreign country."  (*See* Ex. 21 at 9; Ex. 23 at 15; Ex. 25 at 15; Ex. 26 at 2.)  And if the "Yes" box on Line 7a is checked, the filer must also submit a separate report on Form TD F 90-22.1—the FBAR.  (Facts at 9.)  Furthermore, the Form 1040 instructions refer the reader to the FBAR form "to find out if you are considered to have an interest in or signature or other authority over a financial account in a foreign country." (*Id.*)  In turn, the instructions for the FBAR lay out the filing requirements, including that any U.S. person with financial interest in or signature authority over an account must file the FBAR. (*Id.*)

To enforce the reporting requirements, § 5321 provides for a civil money penalty on a person who fails to file a FBAR.  31 U.S.C. § 5321(a)(5)(A).  (The Secretary has delegated assessment authority to the IRS.  31 C.F.R. § 103.56(g) (2009); *see also* 31 C.F.R. § 1010.810(g) (2014).)  Except where the violation is willful, the maximum amount of the penalty is $10,000. *See* § 5321(a)(5)(B)(i), (C).  As discussed in detail below, the penalty does not apply only if the "amount of the transaction or the balance in the account . . . was properly reported" *and* the person had "reasonable cause" for failing to make a timely FBAR report. *See* 31 U.S.C. § 5321(a)(5)(B)(ii).

Liability for a non-willful FBAR penalty is demonstrated when five elements are met. *See United States v. Hom*, 45 F. Supp. 3d 1175, 1178 (N.D. Cal. 2014) *aff'd in part and rev'd in part* 657 Fed. App'x 652 (9th Cir. 2016). These elements are: *First*, the person must have been "subject to the jurisdiction of the United States" during the reporting period. *Second*, the person must have had "a financial interest in, or signature or other authority over, a bank, securities or other financial account." *Third*, the account must have been located in a foreign country. *Fourth*, the balance in the account (or aggregate balance of more than one account) must have exceeded $10,000 at some point during the reporting period. *Fifth*, the person must have failed to report the account as required. *See id.*; 31 C.F.R. § 103.24(a). *Plaintiffs concede all of these elements*. (Facts at 3.)

### B. The Reasonable Cause Defense.

Under 31 U.S.C. § 5321(a)(5)(B)(ii), the non-willful penalty does not apply if the failure to file was due to "reasonable cause," 31 U.S.C. § 5321(a)(5)(B)(ii)(I), *and* "the amount of the transaction or the balance in the account at the time of the transaction was properly reported," 31 U.S.C. § 5321(a)(5)(B)(ii)(II). Plaintiffs bear the burden of demonstrating that both elements are met.

It is first necessary to explain what constitutes "reasonable cause." Neither the statute nor regulations define the term. Courts have relied on an analog in the tax code. *See, e.g.*, *Moore v. United States*, No. C13–2063RAJ, 2015 WL 1510007 at *4 (W.D. Wash. April 1, 2015) ("The court thus takes guidance from tax statutes and authority interpreting them, and concludes that a person has "reasonable cause" for an FBAR violation when he committed that violation despite an exercise of ordinary business care and prudence."). Under I.R.C. § 6651(a)(1), if a taxpayer fails to file a tax return on time, the IRS must add a penalty of 5% of the tax due for each month the return is late (up to a limit of 25%.) The penalty does not apply if

"it is shown that such failure is due to reasonable cause and not due to willful neglect." *Id.* In addition to the similarity of the language, the legislative history suggests that Congress may have had tax penalties in mind when it framed 31 U.S.C. § 5321(a)(5)(B). It explained, "[t]he [FBAR] penalty may be waived if any income from the account was properly reported on the income tax return and there was reasonable cause for the failure to report." H.R. Rep. 108- 755, at 615 (2004) (Conf. Rep.), *reprinted in* 2004 U.S.C.C.A.N. 1341, 1668. The similarity in language and purpose between 31 U.S.C. § 5321 and I.R.C. § 6651 means that it is appropriate for the Court to look to case law and regulations interpreting the latter as persuasive authority.

Treasury Regulation § 301.6651-1(c)(1) describes "reasonable cause" for failure to file a tax return in this manner: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." That is an objective standard. *See United States v. Boyle*, 469 U.S. 241, 248-50 (1985) (explaining that reliance on attorney must be reasonable); *see also Estate of Liftin v. United States*, 754 F.3d 975, 979-81 (Fed. Cir. 2014) (looking to objective reasonableness of advice given to taxpayer). We submit that the Court should apply the same objective standard here.

The second element of the FBAR reasonable cause defense is that "the amount of the transaction or the balance in the account at the time of the transaction was properly reported," § 5321(a)(5)(B)(ii)(II). This element requires an accountholder to have made the United States aware of the existence of the foreign account by filing his or her delinquent FBARs at the time the accountholder first determines his or her obligation.

Congress required U.S. persons to report their foreign financial accounts and imposed penalties for failing to do so as a means of enhancing and achieving tax compliance. The Senate

Committee on Finance noted that the "number of individuals involved in using offshore bank accounts to engage in abusive tax scams has grown significantly in recent years." S. Rep. No. 108-192, at 108 (2003). The Committee reasoned that "improving compliance with [the FBAR] reporting requirement is vitally important to sound tax administration . . . and to preventing the use of abusive tax schemes and scams" and thus "[a]dding a new civil penalty that applies without regard to willfulness will improve compliance with [the FBAR] reporting requirement." *Id.* Thus, the main purpose was to ensure that taxpayers reported foreign accounts so that the U.S. could properly tax individuals on the income earned in through these foreign accounts and end offshore tax shelters.

Allowing a reasonable cause defense without having an additional reporting requirement would hamper the goal of ending offshore tax avoidance. Unlike many other payors of income on the tax return, foreign financial institutions do not provide third party reporting that the IRS can use to determine whether a taxpayer may be hiding income in an offshore account. Thus, the reasonable cause exception requires the reporting of financial accounts as well as the satisfaction of the reasonable cause test so that the IRS can properly analyze the income the taxpayer received and reported on his or her income tax return. Accordingly, in the case at bar, the Court should determine whether the Jarnagins either reported income from foreign bank accounts on their tax returns or filed timely or delinquent FBARs to report the existence of such foreign bank account.

Because the FBAR "reasonable cause" defense is phrased in the conjunctive, the Jarnagins must prove both elements. If they can prove only one, but not the other, their defense necessarily fails. As explained below, here, the Jarnagins can prove neither the "properly reported" requirement nor the reasonable cause requirement, so their defense founders in any event.

## II. The Jarnagins Are Liable for a Non-Willful FBAR Penalty for Each Year From 2006 through 2009.

It is undisputed that plaintiffs were required to file FBARs for the years at issue and nevertheless failed to do so. Plaintiffs cannot demonstrate that they had reasonable cause for not filing FBARs. "To escape the penalty, the taxpayer bears the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause.'" *United States v. Boyle*, 469 U.S. 241, 245 (1985). Failure to file may be due to reasonable cause where the accountholder "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." Treas. Reg. § 301.6651-1(c)(1). Plaintiffs must also show that they properly reported the account or the income from the account. Because plaintiffs were required to file FBARs, but did not do so, and because they cannot establish the elements of reasonable cause, the United States is entitled to judgment as a matter of law.

### A. The Jarnagins Failed To Report a Foreign Financial Account In Which They Had an Interest and Over Which They Had Signing Authority.

Because the penalties in this case are based on non-willfulness, it need only be shown that the Jarnagins failed to timely file FBARs to report their CIBC account during each of the years at issue, despite their obligation to do so. *See* 31 U.S.C. § 5321(a)(5)(A)-(B). As noted above, there are five elements to establish that the Jarnagins are liable for the FBAR penalty: The penalty attaches when (1) a U.S. person (2) has a financial interest in or signature or similar authority over (3) at least one foreign financial account, (4) the aggregate value of which exceeded $10,000, and which (5) was not properly reported to the Treasury Department. As the undisputed facts show, each element is met.

Each of the five elements is straightforward: the Jarnagins are U.S. citizens (Facts at 3), so from 2006 through 2009, they were both "subject to the jurisdiction of the United States," *see* 31

C.F.R. § 103.24(a). The CIBC account was titled in the name of both Larry Jarnagin and Linda Jarnagin giving both of them a financial interest in the account.[6] (*Id.*; *see also* Exs. 11 at 2; Ex. 12 12 at 2; Ex. 13 at 2; Ex. 14; Ex. 15.) The CIBC account was in a foreign country. (Facts at 3.) Its balance substantially exceeded $10,000 during each of the years at issue—in fact, it was at least 300 times that threshold. (*Id.*; *see also* Exs. 11; 12; 13.) And the Jarnagins failed to file timely FBAR reports. (*See* Facts at 3.)

Because the undisputed facts show that all five elements are met and plaintiffs have not challenged any of the elements, the United States is entitled to judgment as a matter of law that the Jarnagins are liable for the non-willful FBAR penalty, unless plaintiffs can prove reasonable cause.

**B.      The Jarnagins Cannot Establish a Reasonable Cause Defense.**

In their Complaint, the Jarnagins claim that they have a reasonable cause defense to the FBAR penalties. (*See* Compl. ¶¶ 14-15 (ECF No. 1) (asserting that plaintiffs relied on licensed tax professionals).) But any reasonable cause defense the Jarnagins might assert fails as a matter of law. The Jarnagins must prove both the reasonable cause element and the reporting element. Because the Jarnagins failed to report the income from the CIBC account on their tax returns *and failed to timely or even belatedly file FBARs to report the CIBC account*, their defense necessarily fails, and the Court need not consider whether the Jarnagins meet the reasonable cause element. But, even if the Court were to examine the reasonable cause element, it would

---

[6] To be sure, before the FBAR regulations were amended in 2011, they did not define what constituted a "financial interest" in a foreign account. *See McBride*, 908 F. Supp. 2d at 1202-03 & n.3 (noting gap and recent regulation filling it). However, the instructions for the Form TD F 90-22.1 defined a "financial interest" to include a United States person who "is the owner of record or has legal title" to the account. (*See* Ex. 18 at 3; Ex. 19 at 6.) Furthermore, the instructions to Schedule B for U.S. individual income tax returns incorporated that definition. (*See* Ex. 21 at 9; Ex. 23 at 15; Ex. 25 at 15; Ex. 26 at 2.)

find that the Jarnagins failed to exercise ordinary care and prudence in determining their FBAR reporting obligations.

### 1. The Jarnagins Failed to Report Income From the CIBC Account on their Income Tax Return and Failed to File FBARs.

Even if the Jarnagins' reliance on their accountants were reasonable, which it was not, *see infra*, the Jarnagins cannot satisfy the statutory requirements to meet the exception in § 5321. As discussed above, the Jarnagins must prove the "reporting" element of the FBAR reasonable cause defense—whether "the amount of the transaction or the balance in the account at the time of the transaction was properly reported," § 5321(a)(5)(B)(ii)(II).

The "reporting" element requires an accountholder to have made the United States aware of the existence of the foreign account. In the Jarnagins' case, this element might have been met if they had reported the income from the CIBC account on their tax returns. But, they failed to do so. (Facts at 3; Ex. 7 at 5; Ex. 8 at 8; Ex. 9 at 4; Ex. 10 at 4, 18.) Additionally, the Jarnagins could have filed their delinquent FBARs at a number of points. Plaintiffs could have submitted delinquent FBARs in late 2010 or early 2011 after Mr. Zybach and Ms. Fairchild learned about the FBAR filing obligations and first alerted the Jarnagins to the obligations. But, plaintiffs failed to disclose their accounts either on the FBAR or during their audit—*and still have not done so to this day*. (Facts at 3.) Accordingly, plaintiffs have failed to meet the "reporting" element, and are not entitled to relief from the FBAR penalties.

### 2. The Jarnagins Failed to Exercise Ordinary Care and Prudence.

Because plaintiffs have failed to meet the "reporting" requirement, the Court need not go any further, that is, it need not consider any argument on the "reasonable cause" element. Even if the Court were to consider the "reasonable cause" element, it is clear that it should determine that plaintiffs failed to exercise ordinary business care and prudence in determining their

reporting requirements notwithstanding their use of a professional return preparer. Plaintiffs, according to their depositions, failed to review their income returns and simply signed what was put before them. Even a cursory review of their income tax returns would have made it abundantly clear of the requirement for plaintiffs to file FBARs.

It is well-settled that the responsibility to file a tax return is a nondelegable duty. *See Boyle*, 469 U.S. at 248. In general, reasonable cause relief may be granted when a taxpayer exercises ordinary care and prudence in determining his or her tax obligations, but nevertheless is unable to comply with those obligations. *See id.*; Treas. Reg. §§ 301.6651-1(c), 1.6664-4. Circumstances that may indicate reasonable cause include an honest misunderstanding of fact or law that is reasonable in light of all of the relevant facts and circumstances, including the experience, knowledge, and education of the taxpayer. *See* Treas. Reg. § 1.6664-4(b)(1). While engaging an accountant to prepare an income tax return may be "ordinary business care and prudence" prescribed in the Regulations, "to say that it was 'reasonable' for the [accountholder] to *assume* that the [accountant] would comply with the statute" does not resolve the matter with respect to the accountholder's obligations under the statute. *Boyle*, 469 U.S. at 250 ("Congress has charged the executor with an unambiguous, precisely defined duty to file the return within nine months . . . That the attorney, as the executor's agent, was expected to attend to the matter does not relieve the principal of his duty to comply with the statute.").

On the undisputed facts of this case, plaintiffs cannot establish reasonable care and prudence in determining their filing responsibilities. Specifically, plaintiffs admit that they never reviewed their tax returns prior to filing, which review would have put them on notice of the FBAR filing requirements. (Facts at 7–9.) "It is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of

perjury, and submitted to the IRS." *United States v. McBride*, 908 F. Supp. 2d 1186, 1206 (D. Utah 2012); *see Moore*, 2015 WL 1510007 at *6. "A taxpayer's signature on a return is sufficient proof of a taxpayer's knowledge of the instructions contained in the tax return form and in other contexts. *McBride*, 908 F. Supp. 2d at 1206; *accord Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d 364, 374 (2d Cir. 2000). And, accountholders cannot use their failure to review their returns as an excuse for failing to comply with their legal obligations— obligations of which they would have been clearly aware had they reviewed the tax returns. As the Sixth Circuit stated: "A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." *Greer v. Commissioner*, 595 F.3d 338, 347 n.4 (6th Cir. 2010).

At a minimum, if plaintiffs had reviewed their Form 1040 for *any* year at issue, they would have plainly seen the question on line 7a of Part III of Schedule B asking if at any point during the year, they had "an interest in or signature or author authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account". (Ex. 7 at 5; Ex. 8 at 8; Ex. 9 at 4; Ex. 10 at 4; Ex. 20 at 2; Ex. 22 at 2; Ex. 24 at 2; Ex. 26 at 1.) The directions on line 7a also instruct taxpayers to "[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1." (*Id.*) These instructions in turn provide an explanation of the FBAR filing requirements. (Ex. 21 at 9; Ex. 23 at 15; Ex. 25 at 15; Ex. 26 at 2.) Thus, both the yes-or-no question on line 7a and the instructions referred to by line 7a would have put the Jarnagins "on inquiry notice of the FBAR requirement." *United States v. Williams*, 489 Fed. App'x 655, 659 (4th Cir. 2012); *accord McBride*, 908 Fed. Supp. at 1206; *see also Moore*, 2015 WL 1510007 at *6.

Moreover, the Jarnagins *signed* their federal tax returns for all four years at issue.[7] (Ex. 7 at 3; Ex. 8 at 3; Ex. 9 at 2; Ex. 10 at 2.) Accordingly, the Jarnagins are charged with having reviewed their tax returns, including understanding that the federal income tax return poses the question whether at any time during the tax year, the taxpayers held any financial interest in any foreign bank or financial account. *See McBride*, 908 Fed. Supp. at 1206.

Plaintiffs' claimed process of merely handing over documents without much interaction with the return preparers and signing their returns without any level of substantive review of the return as a whole—which we necessarily accept as true for the purpose of this motion—stands in stark contrast to the significant business experience and acumen of the plaintiffs, shown in the Facts. Furthermore, it shows that had they taken just a little more care, they would have easily discovered the need to file an FBAR.

Thus, in failing to review their tax returns, which would have put them on inquiry notice to discuss their response with their return preparers and seek the instructions to the tax return, plaintiffs demonstrated that they did not exercise reasonable care in establishing their filing responsibilities; and their reasonable cause defense is thus unavailing.

---

[7] For all of years at issue, Mrs. Jarnagin signed the tax returns for Mr. Jarnagin. Both the Jarnagins stated that Mrs. Jarnagin signed for Mr. Jarnagin as agent under a power of attorney. (Larry Tr. Ex. 3 at 63:8–15, 65:6–10; Linda Tr. Ex. 4 at 50:24–51:7, 52:11–18, 57:10–58:2, 63:6–12.) Moreover, Mr. Jarnagin cursorily spoke with Mrs. Jarnagin regarding the returns prior to filing mainly by asking what the amount of tax owed was. (Linda Tr. Ex. 4 at 51:8–12, 53:15–2163:22–24.) Although the Jarnagins failed to follow the Treasury Regulations applicable to returns made by agents, *see* Treas. Reg. 1.6012-1(a)(5), Mr. Jarnagin did adopt the returns as his own. As personal knowledge is not required to establish a non-willful penalty or a defense to it, Mrs. Jarnagin's signature for Mr. Jarnagin is sufficient to establish his liability. *See Howell v. Commissioner*, 175 F.2d 240, 241 (6th Cir. 1949) (holding that "where [one spouse] files a joint return without objection of the [second spouse], [and the second spouse] fails to file a separate return, it will be presumed the joint return was filed with the tacit consent of the [second spouse]").

### 3. The Jarnagins' Reliance on Their Accountants Was Not Reasonable.

Reliance on professional advice may constitute reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. *See Boyle*, 469 U.S. at 250-51; *Estate of Lifton v. United States*; 754 F.3d 975, 980-81 (Fed. Cir. 2014); *Freytag v. Commissioner*, 89 T.C. 849 (1987), *aff'd* 904 F.2d 1011 (5th Cir. 1990), *aff'd* 501 U.S. 868, 888-89 (1991); Treas. Reg. § 1.6664-4(b)(1). As discussed below, the Jarnagins' reliance on their accountants to file FBARs was unreasonable. The Jarnagins' accountants had *no* experience in international tax issues and were thus unqualified to provide any advice on international compliance matters. The Jarnagins never even inquired whether their accountants had any such experience. Moreover, the Jarnagins' accountants, according to the depositions, never provided advice on the filing of FBARs, and thus the Jarnagins had no advice on which to rely.

#### a. The Jarnagins' Accountants Did Not Have Expertise in FBAR Filing Requirements or Any Other International Tax Matters.

In order for reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the subject matter. *See David v. Commissioner*, 43 F.3d 788, 789-90 (2d Cir.1995), *aff'g* T.C. Memo. 1993-621; *Freytag*, 89 T.C. at 888. Plaintiffs are unable to make this showing.

*First*, plaintiffs never inquired into any of their accountants' experience. In fact, plaintiffs knew very little about their accountants' credentials other than that the accountants were CPAs and "seemed knowledgeable." (Facts at 12–17.) Despite filing returns in two countries and having significant foreign assets, plaintiffs admit that they never inquired whether

their accountants had any knowledge or experience with international or cross-border issues. (*Id.*)

*Second*, plaintiffs' accountants, Mr. Zybach and Ms. Fairchild, lacked experience with international or cross-border tax issues, including the necessity of filing FBARs. (*Id.*) Mr. Zybach and Ms. Fairchild admit that they had never prepared a FBAR prior to 2011. (Facts at 16–17.) In fact, the accountants did not even know of FBAR prior to November 2010. (*Id.*) They further admit that, during the years at issue, they were not familiar with FBAR reporting requirements despite its being a basic requirement of the U.S. tax system. (*Id.*)

*Third*, plaintiffs' accountants did not have knowledge of the pertinent facts that would allow them to give advice. Although the accountants knew of the existence of the CIBC accounts, they themselves were unaware of the division of responsibilities with respect to the accounts. (Facts at 15–16.) As Mr. Zybach testified, he assumed that the Jarnagins' Canadian accountants handled anything related to the Jarnagins' Canadian businesses and accounts. (*Id.*) Without this information, the accountants would not be able to accurately and completely prepare the FBAR returns or the U.S. income tax returns.[8]

### b. The Jarnagins Never Inquired of Their Accountants for Advice on FBARs or Cross-Border Issues.

In order for reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must also have inquired of the professional and relied on the advice given. *Henningsen v. Commissioner*, 243 F.2d 954, 958-59 (4th Cir. 1957) (denying a reasonable cause defense where "there was no showing that the taxpayer *sought* or relied upon the advice of counsel")

---

[8] While there is no testimony from Mr. Gordon relating to his experience with international tax issues or his knowledge of the pertinent facts, as he is deceased, the fact that plaintiffs failed to even inquire as to his credentials, as they admit, is sufficient to show that they cannot meet their burden to show reasonable cause for the years in which he prepared the tax returns.

(emphasis added).  In fact, an accountholder is not relieved from liability where he or she does not seek direct advice on whether to file a return.  In other words, an individual must ask the return preparer for advice on a topic before he or she could rely on the advice (or lack thereof).  Not receiving advice from a return preparer because one did not *ask* for advice does not constitute reasonable cause.  *See N.Y. State Ass'n of Real Estate Bds. Grp. Ins. Fund v. Commissioner*, 54 T.C. 1325, 1336 (1970) (holding that where there was no showing taxpayer ever sought direct advice on whether to file a return such taxpayer is not relieved from legal obligations merely because it was not offered unsolicited advice (citing *Knollwood Mem'l Gardens v. Commissioner*, 46 T.C. 764, 795 (1966))).

Plaintiffs have not shown any actual reliance on their return preparers.  In situations in which an individual has been excused from a failure-to-file penalty on the grounds of reasonable reliance, the substantive advice of a competent accountant or attorney had turned out to be mistaken.  *See Boyle*, 469 U.S. at 250 (noting that courts have held that reasonable cause is established where a taxpayer relies on counsel's mistaken advice that no return need be filed at all); *cf. Linmar Prop. Mgmt. Trust v. Commissioner*, T.C. Memo. 2008-219, 2008 WL 4366069, at *11 (2008) (ruling that a taxpayer could not show reasonable cause for failure to file a return absent evidence of his tax adviser's expertise and that the taxpayer had presented the adviser with all relevant information)).

Here, however, plaintiffs did not rely on the substantive advice of their accountants.  The Jarnagins never asked their accountants to provide advice on international or cross-border issues, including FBAR filings.  Indeed, their accountants provided *no* such advice, and plaintiffs cannot rely on advice that, through their own fault, they never received.  *See Russian Recovery Fund Ltd. v. United States*, 122 Fed. Cl. 600, 623 (2015) ("[T]he only record [RRF] offers of 'advice'

given to RRF concerning the propriety of taking the losses is the returns themselves. There are no backup memos or records of conversations concerning the propriety of claiming built-in losses. We are simply asked to accept that, by signing off on the returns for 1999 and 2000, E[rnst] & Y[oung] was giving its considered advice on whether it was appropriate to take the loss deduction.") *aff'd* Nos. 2016-1718, 2016-1719, slip op. at 27 (Fed. Cir. March 14, 2017); *see also Richardson v. Commissioner*, 125 F.3d 551, 558 (7th Cir. 1997) (finding no reasonable cause where, "other than the fact that a tax preparer signed [the taxpayer's] returns, there [was] no evidence in the record that [the taxpayer] received any advice from professionals"); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 100 (2000) ("The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein."), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

This Court's resolution of reasonable reliance on an accountant in the context of I.R.C. § 6651 penalties in *Gonzales v. United States*, 115 Fed. Cl. 779, 792-93 (2014), is instructive. . In *Gonzales*, the plaintiff believed that he was entitled to reasonable cause relief for failure to file an excise tax return because he had hired an accountant to advise him on his taxes and informed the accountant about the vehicle that was the subject of the excise tax. The accountant, however, admitted that he had never prepared an excise tax return, was not familiar with excise tax rules, and did not advise clients on liability for excise taxes. Additionally, in *Gonzales*, the accountant did not advise plaintiff as to any tax consequences that may result from the purchase of the vehicle at issue, and in fact recalled the *plaintiff* telling *him* (the accountant) about the excise taxes. The Court held in *Gonzales* that the "plaintiff [could not] rely on an accountant's advice as reasonable cause for failing to pay the relevant excise tax when the accountant offered no such counsel and had no expertise in excise tax liability." *Id.* at 793.

The facts of the case at bar are strikingly similar—albeit in the context of penalties associated with the failure to file FBARs, rather than tax returns under I.R.C. § 6651—and warrant similar treatment under the law. With respect to the 2008 and 2009 tax returns, the Jarnagins' accountants admit that they had never prepared a FBAR prior to 2011—and in fact did not even know of FBAR prior to November 2010. They further admit that, during the years at issue, they were not familiar with FBAR reporting requirements, and they had never counseled a client on the matter. Lastly, the accountants admit to never having offered plaintiffs advice on FBAR filing requirements. Similarly, the Jarnagins cannot rely on their accountant's advice as reasonable cause for failing to file FBARs when their accountants had offered no advice and had no experience with the FBAR reporting requirements. Where, as here, there is a complete absence of advice from an accountant, and the return preparers have no experience with the FBAR filing requirements, it is impossible to claim reasonable reliance on a return preparer.

As for the years 2006 and 2007, for which Mike Gordon prepared the tax returns, there is no similar admission as the ones made by Mr. Zybach and Ms. Fairchild about his lack of knowledge of the FBAR requirement. But, plaintiffs themselves admitted that they never inquired into Mr. Gordon's qualifications or knowledge of any international tax issues, including the FBAR requirement, and they never asked him any substantive questions regarding the return or FBAR reporting requirements, and thus never sought or received advice on which they could rely. (Facts 7–8, 12–13.) Thus, for these two years as well, as Mr. Gordon gave no advice based on plaintiffs own admission, there can be no reasonable reliance.

## CONCLUSION

For the reasons set forth herein, plaintiffs are not entitled to a refund of the FBAR penalties. Accordingly, the United States respectfully requests that the Court grant its motion for summary judgment, and enter judgment in favor of the United States and against the plaintiffs.

Respectfully submitted,

_____3/24/2017_____           _/s/ Jason S. Selmont_____
Date

JASON S. SELMONT
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Ben Franklin Station, PO Box 26
Washington, D.C. 20044
Tel:  (202) 616-3338
Fax:  (202) 514-9440
jason.s.selmont@usdoj.gov

DAVID A. HUBBERT
Acting Assistant Attorney General
DAVID I. PINCUS
Chief, Court of Federal Claims Section
BLAINE G. SAITO
Trial Attorney


_/s/ David I. Pincus_____
Of Counsel