# In the United States Court of Federal Claims

No. 15-1534T
(Filed: November 30, 2017)

| | |
|---|---|
| LARRY D. JARNAGIN AND LINDA JARNAGIN, | Keywords: Tax Refund; Illegal Exaction; IRS; Bank Secrecy Act; Report of Foreign Bank and Financial Accounts; FBAR; Reasonable Cause; Ordinary Business Care and Prudence. |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

*Jason M. Silver*, Scottsdale, AZ, for Plaintiffs.

*Jason S. Selmont*, U.S. Department of Justice, Tax Division, Court of Federal Claims Section, Washington, DC, with whom were *Blaine G. Saito*, Trial Attorney, *David I. Pincus*, Chief, Court of Federal Claims Section, and *David A. Hubbert*, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

In this case, plaintiffs Larry and Linda Jarnagin, husband and wife, assert that the IRS wrongfully assessed and collected penalties from them for the 2006, 2007, 2008, and 2009 tax years based on their failure to file certain reports regarding their foreign bank account as required by the Bank Secrecy Act. Mr. Jarnagin, a dual U.S.-Canadian citizen, and Mrs. Jarnagin, a U.S. citizen with Canadian residency status, do not dispute that they owned an account at the Canadian Imperial Bank of Commerce during each of the tax years at issue. They also do not dispute that they were required by law to file a report regarding that account with the IRS for each of those years and that they failed to do so. They assert instead that their failure to file the reports was due to reasonable cause and that the IRS was therefore barred from assessing and collecting the penalty by 31 U.S.C. § 5321(a)(5)(B)(ii).

For the reasons set forth below, the Court concludes that the Jarnagins did not exercise ordinary business care and prudence with respect to their obligation to file the reports at issue and thus cannot avail themselves of the reasonable cause defense. Accordingly, the government's motion for summary judgment is **GRANTED** and the Jarnagins' motion for summary judgment is **DENIED**.

## BACKGROUND

### I.     The Statutory Framework

In 1970, Congress enacted the Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114, in order to address its concerns over "the use by American residents of foreign financial facilities located in jurisdictions with various types of secrecy laws." H.R. Rep. No. 91-075 (1970), reprinted in 1970 U.S.C.C.A.N. 4394, 4395. "[C]onsiderable testimony" had been presented to Congress regarding "serious and widespread use of foreign financial facilities located in secrecy jurisdictions for the purpose of violating American law." Id. at 4397. In the Bank Secrecy Act, Congress responded by imposing on residents, citizens, or persons doing business in the United States a requirement that they keep records and make reports concerning certain foreign accounts and transactions. 31 U.S.C. § 5314(a) (2006)[1]; see also id. § 5311 (stating that the "purpose" of the Act is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism").

The statute thus provides, in pertinent part, that "the Secretary of the Treasury shall require a resident or citizen of the United States . . . to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency." Id. § 5314(a). The Secretary of the Treasury has issued regulations implementing the statutory requirements. They state, in pertinent part, as follows:

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons.

31 C.F.R. § 1010.350(a) (2016).[2] The reporting form prescribed under 31 U.S.C. § 5314 and referenced in the regulation is Form TD-F 90-22.1 (entitled "Report of Foreign Bank and Financial Accounts"). Id.[3] Under the regulations, the form must be filed "on or before June 30 of

---

[1] Because the penalties collected by the IRS in this matter were based on violations relating to the 2006, 2007, 2008, and 2009 tax years, the Court's citations to the United States Code are to the 2006 codification, unless otherwise noted.

[2] During the years at issue in this case, this regulation was located at 31 C.F.R. § 103.24, but was relocated without substantive change in 2011. See Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed. Reg. 65806-01 (Oct. 26, 2010).

[3] The form is also referred to as an "FBAR." United States v. Simon, 727 F.3d 682, 685 (7th Cir. 2013); see also 31 C.F.R. § 1010.350(g)(4).

each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." Id. § 1010.306(c) (previously codified at 31 C.F.R. § 103.27).

The statute authorizes the Secretary of the Treasury to impose a civil monetary penalty of not more than $10,000 for failure to file the Form TD-F 90-22.1. See 31 U.S.C. § 5321(a)(5) (providing that if "any person . . . violates, or causes any violation of, any provision of section 5314," then "[t]he Secretary of the Treasury may impose a civil money penalty," not to exceed $10,000). "No penalty shall be imposed . . . with respect to any violation," however, "if— (I) such violation was due to reasonable cause, and (II) the amount of the transaction or the balance in the account at the time of the transaction was properly reported." Id. § 5321(a)(5)(B)(ii).

## II.   Undisputed Facts

### A.   The Jarnagins' Educational and Business Backgrounds

Plaintiff Larry Jarnagin is a high school graduate. Def.'s Am. App. B Ex. 3 at 9, ECF No. 22-1. Although he does not have a college degree, he took courses at New Mexico Western University in approximately 1963 or 1964. See id. In addition, Mr. Jarnagin completed both barbering school and chiropractic school, and practiced professionally as a chiropractor for five years. Id. at 9–10. Mr. Jarnagin also owned and operated a number of barbershops in New Mexico. Id. at 13.

Linda Jarnagin attended multiple community colleges in Iowa and New Mexico in the 1960s and 1970s, taking classes in elementary education. Id. Ex. 4 at 8–9. She did not obtain a degree. Id. In the late 1970s, Mrs. Jarnagin took classes at a vocational technical school in order to obtain a real estate broker's license. Id. at 11. In approximately 1978, she passed her licensing exam. See id. at 9, 11–12. For about the next four years, Mrs. Jarnagin worked as a real estate broker. Id. at 14–15.

The Jarnagins were married in 1966. Id. at 8. They moved to Oklahoma around 1971, where Mr. Jarnagin, in addition to barbering, became a cattle farmer and began buying and selling farms. Id. Ex. 3 at 13. He also began buying, selling, and leasing oil and mineral rights. Id. at 16. Mr. Jarnagin has since continuously been involved in the real estate business. See id. at 16–17. He has set up and used corporations, limited liability companies, and "C Corps" for the purpose of buying and selling property. Id. at 17.

In the early- to mid-1980s, Mr. Jarnagin bought property in Canada and began operating his own ranch in British Columbia. Id. at 18–20. In 1986, the Jarnagins immigrated to Canada. Id. at 19. In 1989, Mr. Jarnagin became a Canadian citizen. Id. He currently resides in Canada approximately nine to ten months out of the year. Id. at 95. Mrs. Jarnagin spends more of her time in Oklahoma than in Canada. See id. at 95–96; see also id. Ex. 4 at 53; id. Ex. 5 at 30–31.

In the early 1990s, the Jarnagins purchased a number of apartment complexes in Oklahoma. Id. Ex. 3 at 20–21. At one point, they owned as many as six different properties. See id. Ex. 4 at 18. Mrs. Jarnagin "actively manage[d]" them. Id. Ex. 3 at 21. She served as the

"property supervisor" and oversaw on-site managers, maintenance, and landscaping. Id. Ex. 4 at 18. In the 2000s, the Jarnagins sold or transferred the apartment complexes. Id. at 18–19. In particular, in 2006, the Jarnagins engaged in a property exchange known as a "1031," whereby they exchanged one of the apartment complexes for a shopping center in Oklahoma City, which they still own.[4] Id. at 19.

The Jarnagins also became owners of a nightclub in Phoenix, Arizona in the mid- or late-1990s, by virtue of their status as creditors in a bankruptcy proceeding. See id. Ex. 3 at 22; id. Ex 4 at 20. Ultimately, Mrs. Jarnagin went to Phoenix and took over the operations of the nightclub directly. See id. Ex. 3 at 22–23; id. Ex. 4 at 20–21. In 2006, the property was taken by the city of Phoenix through its power of eminent domain. Id. Ex. 4 at 22.

### B.    The Jarnagins' Canadian Bank Account and Their 2006–2009 Personal Income Tax Returns

In 1986, the Jarnagins opened a bank account in Canada at the Canadian Imperial Bank of Commerce. See id. Ex. 3 at 26–27. They continued to own and maintain this account throughout 2006, 2007, 2008, and 2009. Id. Ex 1 at 1–3, 6. At the end of 2006, the Jarnagins' account had a balance of $4,000,000. Id. at 1. At the end of 2007, the account had a balance of $3,500,000. Id. at 2. At the end of 2008, it had a balance of $3,850,000. Id. And in 2009, the account had a balance of at least $1,870,000. See id. at 2–3; see also id. Ex. 31 at 2, ECF No. 22-9.

For tax years 2006 through 2009, the Jarnagins filed joint Form 1040 Individual Income Tax Returns. Id. Ex. 7, ECF No 22-2; id. Ex. 8, ECF No. 22-4; id. Ex. 9, ECF No. 22-6; id. Ex. 10, ECF No. 22-7. Schedule B of each of those tax returns contained a section entitled "Part III Foreign Accounts and Trusts." See, e.g., id. Ex. 7 at 5. In that section, line 7a required a response to the following question:

> At any time during [the relevant tax year], did you have an interest
> in or a signature or other authority over a financial account in a
> foreign country, such as a bank account, securities account, or other
> financial account?

Id. The form then contained checkboxes for answering the question either yes or no and directed filers to "[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1." Id.

On their 2006, 2007, 2008, and 2009 tax returns, the Jarnagins' accountants (see below) checked the "no" box in response to line 7a, notwithstanding that the Jarnagins maintained a bank account in Canada during those years. Id.; id. Ex. 8 at 8; id. Ex 9 at 4; id. Ex. 10 at 4. In

---

[4] The characterization of this exchange as a "1031" is based on 26 U.S.C. § 1031. That section states in pertinent part that "[n]o gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." Id. § 1031(a)(1).

addition, the Jarnagins did not file an FBAR reporting their Canadian bank account during any of those years. Id. Ex. 1 at 3–6.

### C.      The Jarnagins' Bookkeeper

The Jarnagins employed the services of a bookkeeper—Misty Fairchild—to help manage the financial aspects of their businesses and to provide information to the accountants who prepared their tax returns (see below). Ms. Fairchild first began to perform bookkeeping services for the Jarnagins in January 1997 while she was still in college. Id. Ex. 3 at 34; id. Ex. 4 at 25; id. Ex. 5 at 12. The Jarnagins hired her because of the friendship between Mrs. Jarnagin and Ms. Fairchild's mother, and because Mrs. Jarnagin had learned that Ms. Fairchild was studying to be an accountant. Id. Ex. 4 at 25.

Ms. Fairchild initially helped manage the Jarnagins' apartments by keeping track of income and expenses at the properties. Id. Ex. 3 at 38. Her duties later expanded to include preparing annual financial statements for the Jarnagins and other daily financial management and bookkeeping tasks. See id. Ex. 4 at 27–28, 66–68; id. Ex. 5 at 13; see also id. Exs. 11–13. Ms. Fairchild was aware that the Jarnagins had a Canadian bank account. Id. Ex. 5 at 44–45. She did not, however, have any knowledge of or experience related to international tax matters. Id. Ex. 3 at 39; id. Ex. 4 at 26; id. Ex. 5 at 66. Nor did she know anything about filing tax returns for a person with foreign sources of income. Id. Ex. 5 at 67.

In 1998, Ms. Fairchild graduated from Southwestern Oklahoma State University with a bachelor's degree in accounting with a minor in finance. Id. Ex. 5 at 9. In 2000, she obtained her master's degree in business administration. Id. Ms. Fairchild then became a licensed certified public accountant (CPA) in 2002. Id. at 10. She continued to work for the Jarnagins during this period.

In August 2004, Ms. Fairchild took a position as a comptroller with a bank. Id. at 12, 14–15; id. Ex. 4 at 25–26. She nonetheless continued to perform bookkeeping and accounting-type work in a part-time, consulting role for the Jarnagins. Id. Ex. 5 at 15. While working in the banking industry, Ms. Fairchild did not have any responsibilities for or experience with international tax or cross-border issues. Id. at 19, 23. In 2010, Ms. Fairchild left the banking industry and opened an accounting firm with her brother, Kyle Zybach (discussed below). Id. at 23.

### D.      The Jarnagins' Accountants

The Jarnagins did not personally prepare their income tax returns for tax years 2006 through 2009. See id. Ex. 3 at 30–31. Instead, they employed the services of accountants in both Canada and the United States to prepare and file their Canadian and U.S. tax returns, respectively. See id. at 30–34.

Prior to the tax years at issue in this case, the Jarnagins' U.S. tax returns were prepared by James Crook, an accountant and former IRS employee. Id. at 33, 43. After Mr. Crook passed away in 2005, his firm continued to prepare the Jarnagins' tax returns, starting with their return for 2005, which was prepared by Mike Gordon. See id. at 33–34, 49–50; id. Ex. 4 at 33–34; id. Ex. 16 ¶ 15. The Jarnagins testified that Mr. Gordon was a CPA but that they otherwise had "no

idea" what his qualifications were and did not know whether or not he had any knowledge about, or experience with, issues of international taxation. Id. Ex. 4 at 34–35; see also id. Ex. 3 at 50.

Shortly thereafter, Mr. Gordon passed away and Mr. Crook's widow took over the preparation of the Jarnagins' tax returns for tax years 2006 and 2007. Id. Ex. 3 at 50; see also id. Ex. 7 at 3 (the Jarnagins' 2006 tax return reflecting Marie Crook as tax preparer); id. Ex. 8 at 3 (the Jarnagins' 2007 tax return showing the same). Mr. Jarnagin was unsure of Mrs. Crook's qualifications and did not know whether or not she was a CPA. Id. Ex. 3 at 52–53.

For tax years 2008 and 2009, the Jarnagins turned to a new accountant, Kyle Zybach, the brother of Ms. Fairchild, their bookkeeper. See id. at 34; id. Ex. 9 at 2; id. Ex. 10 at 2. The Jarnagins knew that Mr. Zybach was a CPA but did not know or inquire whether he had any knowledge about or experience with international tax matters. Id. Ex. 3 at 55. Mr. Zybach testified that he had no such prior experience. Id. Ex. 6 at 10–11.

The Jarnagins never expressly informed Mr. Gordon, Mrs. Crook, or Mr. Zybach that they maintained a bank account in Canada. See id. Ex. 3 at 45–46, 56; id. Ex. 4 at 37–38; see also id. Ex. 6 at 23. Nor did the Jarnagins provide any statements from the Canadian account to any of their U.S. accountants. See id. Ex. 3 at 45–46, 51–52, 54–56; see also id. Ex. 4 at 37.

Both Mr. and Mrs. Jarnagin testified that they believed their accountants would have been aware that they maintained a bank account in Canada because their Canadian businesses and residence were common knowledge. See id. Ex. 3 at 44–46, 50–51, 56; id. Ex. 4 at 37–38, 68–69, 71–72. In addition, the Jarnagins' annual financial statements (which they supplied to their U.S. accountants) contained references to a Canadian bank account. Id. Ex. 11 at 2; id. Ex. 12 at 2; id. Ex. 13 at 2 (financial statements provided by the Jarnagins to their U.S. accountants for 2006, 2007, and 2008 listing a personal "CD/Savings" account at "CIBC" in Canadian dollars); see also id. Ex. 3 at 44–46, 50–51, 56; id. Ex. 4 at 37–38, 68–69, 71–72. The Jarnagins also believed that their U.S. accountants would have inferred the existence of a Canadian bank account given that they were required to send the Jarnagins' U.S. tax information to Canadian accountants each year so that those accountants could file the Jarnagins' Canadian tax returns. See id. Ex. 3 at 44–45; id. Ex. 4 at 36–38; see also id. Ex. 5 at 45–46.

The record supports the Jarnagins' expectation that their U.S. accountants would have known of their Canadian bank account notwithstanding the Jarnagins' failure to directly draw their U.S. accountants' attention to its existence. Thus, Mr. Zybach testified that while he did not recall ever being directly told about the Canadian account, he was aware of it "from [his] prior experience and from looking at the financial statements that were provided." Id. Ex. 6 at 23.

### E.    The Jarnagins' Role in Preparing Their Tax Returns

The Jarnagins had little involvement in the preparation of their tax returns for tax years 2006 through 2009. Mr. Jarnagin explained that "[b]asically, we handed everything over to the accountants, [said] '[h]ere, take care of it and tell us how much we owe,' and that's about it." Id. Ex. 3 at 44; see also id. at 57–58. Similarly, Mrs. Jarnagin testified that they "just turned everything over to [Mr. Gordon] that needed to be done." Id. Ex. 4 at 44–45. She also recalled that the Jarnagins played a similarly passive role when Mr. Zybach prepared their returns; she

did not remember any discussions regarding tax planning, only rare meetings to provide records. Id. at 45–46.

Mr. and Mrs. Jarnagin both signed their names under the declaration contained at the end of the Forms 1040 that they filed for each of the years at issue in this case. Id. Ex. 7 at 3; id. Ex. 8 at 3; id. Ex. 9 at 2; id. Ex. 10 at 2; see also id. Ex. 4 at 50–51, 57, 62–63. Those declarations read as follows:

> Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete.

E.g., id. Ex. 10 at 2.

Notwithstanding this declaration, however, Mr. Jarnagin testified that he did not review his 2006 tax return prior to filing it. Id. Ex. 3 at 59–60. Nor did he ask any questions of Mrs. Crook or anyone else at her firm regarding the return. Id. Mr. Jarnagin also did not review the tax returns his U.S. accountants filed in tax years 2007, 2008, and 2009. Id. at 64–66, 68–69, 71–72.

Mrs. Jarnagin testified that she did not "usually have time to review [the returns], but [she did] look to see how much [they] owe[d]." Id. Ex. 4 at 48. She thus did not review the 2006, 2007, 2008, or 2009 tax returns other than to learn the amount of tax owed. See id. at 48, 52–53, 56–58, 62–63; see also id. Ex. 6 at 22 (Kyle Zybach testifying that the Jarnagins "normally didn't really want to look over the whole return, just kind of the 1040, total income, how much tax do [they] owe or what are [they] getting a refund for" and that he did not sit down with the Jarnagins to go over their returns).

### F.     Penalties Imposed by the IRS

On June 28, 2012, the IRS sent letters to Mr. and Mrs. Jarnagin "proposing a penalty for violating the reporting or record keeping requirements relating to accounts [they] maintain with financial institutions overseas." Id. Ex. 28 at 1; id. Ex. 29 at 1. Specifically, the IRS informed the Jarnagins that it was "proposing the assessment of a penalty under 31 U.S.C. § 5321(a)(5) for failing to meet the filing requirements of 31 U.S.C. § 5314." Id. Ex. 28 at 1; id. Ex. 29 at 1. The total proposed penalty was $100,000, representing $10,000 each for Mr. and Mrs. Jarnagin for each tax year 2006 through 2010, inclusive, based upon their failure to report their bank account at the Canadian Imperial Bank of Commerce. Id. Ex. 28 at 5; id. Ex. 29 at 5.

The Jarnagins disputed the proposed penalties with the IRS in August 2012. Compl. Ex. C, ECF No. 1. Ultimately, in late 2015, the IRS agreed to withdraw its proposed penalty for 2010, but asserted that the Jarnagins were liable for the "Report of Foreign Bank and Financial Accounts (FBAR) penalty" for 2006, 2007, 2008, and 2009, and demanded payment of $40,000 each from Mr. and Mrs. Jarnagin. See Compl. Exs. A–B; Def.'s Am. App. B Exs. 30–31.

On November 10, 2015, Mr. and Mrs. Jarnagin each paid a $40,000 FBAR penalty. Compl. Ex. B. On November 13, 2015, the Jarnagins filed a Form 843, seeking an abatement and refund of the penalty amounts paid. Compl. Ex. C. The Jarnagins allege that the IRS denied that request. Compl. ¶ 11.

III.     **This Action**

On December 16, 2015, the Jarnagins filed the present suit. ECF No. 1. In their complaint they assert one count, which is entitled "Wrongful Assessment and Collection of Penalties." Id. at 3. The Jarnagins allege that their "failure to file a[n] FBAR for tax years 2006, 2007, 2008 and 2009, was due to reasonable cause," and that "[t]he IRS illegally or unlawfully failed to grant [the] Jarnagin[]s['] claims for refund of the FBAR penalties paid for tax years 2006, 2007, 2008 and 2009." Id. ¶¶ 14, 16. They seek judgment in the amount of $80,000, plus interest, attorneys' fees, and costs. Id. at 4.

This case was initially assigned to Senior Judge James F. Merow, but was transferred to the undersigned on January 11, 2017. See ECF No. 16. On March 24, 2017, the government filed a motion for summary judgment. ECF No. 19. On May 10, 2017, the Jarnagins filed their response and cross-motion for summary judgment. ECF No. 25. The parties finished briefing the cross-motions on June 30, 2017, but on August 9, 2017, the government sought leave to file a surreply. ECF No. 30. The Court granted leave the next day. ECF No. 31. The Jarnagins then filed their own surreply on August 23, 2017. ECF No. 33. On November 20, 2017, the Court held oral argument on the parties' cross-motions. See Order, ECF No. 35.

**DISCUSSION**

I.     **Subject Matter Jurisdiction**

Neither party has substantively addressed in its briefs the Court's subject matter jurisdiction over this case. Subject matter jurisdiction, however, is a threshold matter, Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998), and the Court has "an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party," Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006).

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012). Under this grant, the court may assert jurisdiction over a complaint (such as this one) alleging an illegal exaction if the plaintiff alleges that "money . . . was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute or a regulation.'" Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 605 (1967)); see also Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996) (observing that "Tucker Act claims may be made for recovery of monies that the government has required to be paid contrary to law"); S. P.R. Sugar Co. Trading Corp. v. United States, 167 Ct. Cl. 236, 244–45 (1964) (finding that "[u]nder [the Tucker Act], suit can be brought in this court to recover exactions said to have been illegally imposed by federal officials (except where Congress has expressly placed jurisdiction elsewhere)"); Clapp v. United States, 127 Ct. Cl. 505, 513 (1954) (stating that "a claim to recover an illegal exaction made by officials of the Government, which exaction is based upon a power supposedly conferred by a statute, is a claim founded upon any Act of Congress").

Here, the Jarnagins assert that the government's assessment and collection of FBAR penalties was unlawful because 31 U.S.C. § 5321(a)(5) contains a prohibition on penalties where, inter alia, the taxpayer has reasonable cause for failing to file an FBAR. Thus, because the government based its exaction upon an asserted statutory power and because the Jarnagins claim that the penalty was exacted in contravention of that statute, the Jarnagins' claim is one for an illegal exaction and the Court has subject matter jurisdiction over it.

## II.     Summary Judgment Standards

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(a) of the Rules of the Court of Federal Claims; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). All significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "[T]he party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." Id. at 1390–91. "[E]ntry of summary judgment is appropriate against a [party] 'who fails to make a showing sufficient to establish the existence of an essential element to [its] case, and on which [it] will bear the burden of proof at trial.'" Zafer Taahhut Insaat ve Ticaret A.S. v. United States, 833 F.3d 1356, 1362–63 (Fed. Cir. 2016) (quoting Celotex Corp., 477 U.S. at 322) (third and fourth alterations in original).

## III.    The Parties' Cross-Motions for Summary Judgment

In this case, there is no genuine dispute as to any material fact or as to whether the Jarnagins violated the law when they failed to file FBARs for tax years 2006–2009. The disagreement between the parties is whether, as a matter of law, the Jarnagins qualify for an exception to the statutory penalty because "the violation[s were] due to reasonable cause, and . . . the amount of the transaction or the balance in the account at the time of the transaction was properly reported." 31 U.S.C. § 5321(a)(5)(B)(ii); see also Br. in Opp'n to Def.'s Mot. for Summ. J & in Supp. of Pls.' Cross-Mot for Summ. J. (Pls.' Br.) at 14, ECF No. 25 (stating that "Plaintiffs are liable for the non-willful FBAR penalty, except that reasonable cause exists and such is a defense to the imposition of the non-willful FBAR penalty").

The Jarnagins argue that they have established reasonable cause for failing to file FBARs for 2006, 2007, 2008, and 2009. Pls.' Br. at 6. They assert that: 1) "they hired a competent CPA to prepare all required forms"; 2) "the CPA was aware of the CIBC account in Canada through the financial statements provided to him by Plaintiffs before he filed the returns"; and 3) "Plaintiffs actually relied in good faith on the CPA." Id. In short, the Jarnagins argue, "they relied upon their CPA[s] as it related to their tax returns, which is all that is required." Id. at 20.

For the reasons set forth below, the Court concludes that, as a matter of law, the Jarnagins have not established reasonable cause for their violations of the reporting requirement. Accordingly, they do not qualify for an exception from the statutory penalty provision and their request for reimbursement of the penalties paid lacks merit.[5]

## A.   <u>Reasonable Cause Standard</u>

Neither the statute nor its corresponding regulations define "reasonable cause," and there is little case law regarding the meaning and application of the reasonable cause standard under 31 U.S.C. § 5321(a)(5)(B)(ii). <u>See id.</u> § 5312; <u>see also</u> 31 C.F.R. § 1010.100. Sections 6651(a) and 6664(c)(1) of the Internal Revenue Code and their implementing regulations, however, use and define the phrase in the tax compliance context. Accordingly, the Court finds those provisions instructive in construing the reasonable cause standard applicable here. <u>See</u> <u>Bragdon v. Abbott</u>, 524 U.S. 624, 631 (1998) (stating that "Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations"); <u>see also</u> <u>Moore v. United States</u>, No. C13-2063RAJ, 2015 WL 1510007, at *4 (W.D. Wash. Apr. 1, 2015) (concluding that "[t]here is no reason to think that Congress intended the meaning of 'reasonable cause' in the Bank Secrecy Act to differ from the meaning ascribed to it in tax statutes").

The first of those provisions, 26 U.S.C. § 6651(a), prescribes penalties for failing to timely file certain returns or to pay particular taxes "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The regulations implementing § 6651 equate the reasonable cause standard with a standard of ordinary business care and prudence. <u>See</u> 26 C.F.R. § 301.6651-1(c)(1) (stating that "[i]f the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause" and that "[a] failure to pay will be considered to be due to reasonable cause to the extent the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date"); <u>see also</u> <u>United States v. Boyle</u>, 469 U.S. 241, 246 n.4 (1985) (holding that IRS's "correlation [in its regulation] of 'reasonable cause' with 'ordinary business care and prudence' is consistent with Congress' intent, and over 40 years of case law" and "merits deference").

Similarly, 26 U.S.C. § 6664(c)(1) states that "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such

---

[5] In light of the Court's conclusion that the Jarnagins' failure to file FBARs was not due to reasonable cause, it does not address the question of whether the Jarnagins have satisfied the additional criteria for the exception to the FBAR penalty—i.e., that "the amount of the transaction or the balance in the account at the time of the transaction was properly reported." <u>See</u> 31 U.S.C. § 5321(a)(5)(B)(ii).

portion."[6] IRS regulations, in turn, state that with respect to § 6662 underpayments, "[t]he determination of whether a taxpayer acted with reasonable cause . . . is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6664-4(b)(1). They provide that "[g]enerally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id. The regulations further state that "[c]ircumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id. They advise that "[r]eliance on an information return or on the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith." Id. "Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.

The regulations contain examples that illustrate "reasonable cause," and include circumstances in which the taxpayer engages a "professional tax advisor," provides him or her with "full details," and relies upon his or her "advice." Id. § 1.6664-4(b)(2). The regulation defines the word "advice" as "any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly." Id. § 1.6664-4(c)(2).

On the other hand, if the taxpayer "sought advice from someone that [he] knew, or should have known, lacked knowledge in the relevant aspects of Federal tax law, or if other facts demonstrate that [he] failed to act reasonably or in good faith, [he] would not be considered to have shown reasonable cause." Id. § 1.6664-4(b)(2). Additionally, the taxpayer's education, sophistication, and business experience must be considered, "the advice must be based upon all pertinent facts and circumstances," and the advice must not be based on unreasonable factual or legal assumptions. Id.

## B.    Whether the Jarnagins Have Reasonable Cause for Failing to File the FBARs

In light of the foregoing, the Court concludes that in order to show reasonable cause under 31 U.S.C. § 5321(a)(5)(B)(ii), the Jarnagins must establish that they exercised "ordinary business care and prudence" with respect to their obligation to file FBARs for tax years 2006 through 2009. As noted, they assert that they have met their burden of proving their entitlement to the defense by showing that 1) "they hired a competent CPA to prepare all required forms"; 2) "the CPA was aware of the CIBC account in Canada through the financial statements provided to him by Plaintiffs before he filed the returns"; and 3) "Plaintiffs actually relied in good faith on the CPA." Pls.' Br. at 6.

For purposes of ruling on the cross-motions for summary judgment, the Court assumes that the accountants the Jarnagins hired were "competent . . . to prepare all required forms" and were aware that the Jarnagins had a bank account in Canada. Nonetheless, the Court concludes

---

[6] Section 6662 of Title 26 concerns penalties for "accuracy-related" underpayments. Section 6663 concerns the underpayment of taxes "due to fraud."

that, as a matter of law, the Jarnagins did not exercise ordinary business care and prudence in the handling of their reporting obligations.

First, as noted above, IRS regulations specify that in determining reasonable cause, "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." 26 C.F.R. § 1.6664-4(b)(1). The Jarnagins have owned multiple businesses in multiple states and in two countries, yet they apparently did not have any substantive discussions with any of their American accountants about their taxes, did not review their tax returns, and did not specifically identify their Canadian bank account to their American accountants or ask for any advice with respect to that account. Further, while the Jarnagins relied upon their accountants to fill out their tax returns, the record contains no evidence that they otherwise sought advice (legal or otherwise) concerning any obligations that they might have had to file reports or make disclosures concerning their foreign assets or businesses.

Second, ordinary business care and prudence would require that the Jarnagins personally read and review their completed tax returns carefully. Each year the Jarnagins "declare[d]," "[u]nder penalties of perjury," that they "examined th[e] return and accompanying schedules and statements, and [that] to the best of [their] knowledge and belief, it [was] true, correct, and complete." Def.'s Am. App. B Exs. 7–10. Yet it is undisputed that the Jarnagins did not, in fact, read any of their tax returns before signing or filing them. Id. Ex. 3 at 59–60, 64–66, 68–69, 71–72; id. Ex. 4 at 48, 52–53, 56–58, 62–63; see also id. Ex. 6 at 22.

"A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." United States v. Williams, 489 F. App'x 655, 659 (4th Cir. 2012) (quoting Greer v. Comm'r of Internal Revenue, 595 F.3d 338, 347 n.4 (6th Cir. 2010)) (finding that taxpayer willfully violated the FBAR reporting requirement). Further, the Jarnagins had a particular obligation—given Mr. Jarnagin's dual citizenship, his business activities in Canada, and their maintenance of a Canadian bank account with millions of dollars on deposit—to attend to Part III of Schedule B, which is entitled, after all, "Foreign Accounts and Trusts." See United States v. Sturman, 951 F.2d 1466, 1476–77 (6th Cir. 1991) (finding that "[i]t is reasonable to assume that a person who has foreign bank accounts would read the information specified by the government in tax forms"); see also Williams, 489 F. App'x at 659 (observing that not reading line 7a and not paying attention to tax returns "constitute[d] willful blindness to the FBAR requirement" and that line 7a "put [the taxpayer] on inquiry notice of the FBAR requirement").

Had the Jarnagins read the text of Part III, Foreign Accounts and Trusts, they would have seen the obvious error their accountants committed when they answered "no" to the question of whether the Jarnagins had "an interest in . . . a financial account in a foreign country . . . ." Def.'s Am. App. B Ex. 7 at 5; id. Ex. 8 at 8; id. Ex. 9 at 4; id. Ex. 10 at 4. They also would have seen the admonition in that Part to "[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1."[7]

---

[7] In their defense, the Jarnagins assert that the question at line 7a on Schedule B is "in very small font." Pls.' Br. at 4. But the caption of the section, "Part III Foreign Accounts and Trusts," is in bold print and in the same font size as the captions for Parts I and II of Schedule B. See, e.g.,

Further, any individual exercising ordinary business care and prudence would have made inquiry of their accountant about the FBAR filing requirements after having identified the clear error in the response provided to question 7a. In that regard, the Court notes again that the Jarnagins are not unsophisticated in matters of business and finance. They have been involved in multiple real estate transactions, property management, oil and gas leasing, and the management of a nightclub. See id. Exs. 3–4. They have property interests and financial accounts in two countries, and the account at issue in this case reflects substantial wealth. See id.; see also id. Ex. 1. A reasonable person, particularly one with the sophistication, investments, and wealth of the Jarnagins, would not have signed their income tax returns without reading them, would have identified the clear error committed by their accountants, and would have sought advice regarding their obligation to file a Form TD F 90-22.1.

Finally, the Court finds that the mere fact that the Jarnagins' returns were prepared by tax professionals does not excuse their failure to file FBARs. To be sure, IRS regulations provide that a taxpayer's reliance upon the advice of tax professionals may establish reasonable cause for a violation of the tax laws in appropriate circumstances. See 26 C.F.R. § 1.6664-4(c)(2) (stating that advice consists of "any communication, including the opinion of a professional tax advisor, setting forth the analysis or conclusion of a person, other than the taxpayer, provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly"). But the Jarnagins neither requested nor received any advice one way or the other from their accountants regarding whether they were required to file FBARs—that is, their accountants conducted no analysis and drew no conclusions concerning the obligation, nor did they communicate any such conclusion to the Jarnagins. In fact, Mr. Zybach's testimony shows that he himself was unaware of the FBAR requirement and so could not have provided the Jarnagins any advice at all regarding their obligations to file one. The Jarnagins, in other words, cannot use as a shield reliance upon advice that they neither solicited nor received. See Russian Recovery Fund Ltd. v. United States, 122 Fed. Cl. 600, 623 (2015) (stating that "the only record plaintiff offers of 'advice' given to [it] concerning the propriety of taking the losses is the returns themselves" and that the court was thus being "asked to accept that, by signing off on the returns . . . [the accounting firm] was giving its considered advice on whether it was appropriate to take the loss deduction," and rejecting the same), aff'd, 851 F.3d 1253 (Fed. Cir. 2017); see also Richardson v. Comm'r of Internal Revenue, 125 F.3d 551, 558–59 (7th Cir. 1997) ("The record shows only that her returns were signed by a tax preparer. There is no evidence that a professional, after being informed of the circumstances, advised her that she did not have taxable income in the relevant years."); Neonatology Assocs., P.A. v. Comm'r of Internal Revenue, 115 T.C. 43, 100 (2000) ("We also are unpersuaded by petitioners' assertion that they relied reasonably on the correctness of the contents of their returns simply because their returns were prepared by certified public accountants. The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein."), aff'd, 299 F.3d 221 (3d Cir. 2002).

---

Def.'s Am. App. B Ex. 7 at 5. And both the question at line 7a and the admonition regarding the FBAR filing requirement are in the exact same font size as the other lines on Schedule B and the main Form 1040. See id.

In fact, in <u>Boyle</u>, the Supreme Court rejected a similar argument by an estate that it had reasonable cause for the untimely filing of its tax return because it had relied upon the estate's tax attorney to prepare and file the return. 469 U.S. at 249–52. The Court reasoned that the duty to promptly file is "fixed and clear" and placed directly on the taxpayer, "not on some agent or employee of the [taxpayer]." <u>Id.</u> at 249; <u>see also</u> <u>Baccei v. United States</u>, 632 F.3d 1140, 1148 (9th Cir. 2011) (noting that "a taxpayer cannot rely on its employee or agent to escape responsibility for the nonperformance of nondelegable tax duties" and that "reliance upon [a professional advisor] to competently file a payment extension request does not constitute reasonable cause excusing [the taxpayer's] failure to timely pay the estate taxes owed" (quotation omitted)). The Court acknowledged that "[w]hen an accountant or attorney <u>advises</u> a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." <u>Boyle</u>, 469 U.S. at 251 (emphasis in original). Such "reliance" however, "cannot function as a substitute for compliance with an unambiguous statute." <u>Id.</u> The Court thus held that "failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause.'" <u>Id.</u> at 252.

In short, the Court concludes that the Jarnagins did not exercise ordinary business care and prudence and that their failure to file FBARs for the years at issue was not due to reasonable cause. Accordingly, they are not entitled to a refund of the penalties assessed against them.

## CONCLUSION

For the reasons set forth above, the government's motion for summary judgment is **GRANTED** and Plaintiffs' motion for summary judgment is **DENIED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge